62 So.2d 783

**SUN OIL CO. et al. v. OSWELL et al.**

1 Div. 521.

Supreme Court of Alabama.

Jan. 19, 1953.

J. B. Blackburn, Bay Minette, and Mc-Corvey, Turner, Rogers, Johnstone & Adams, Mobile, for appellants.

Albert J. Tully and Holberg, Tully & Aldridge, all of Mobile, for appellees.

FOSTER, Justice.

This case comes here on appeal by the respondents from a decree overruling their separate demurrer to an original bill in equity filed by appellees.

In substance the bill alleges that on September 9, 1942, R. H. Oswell and his wife executed and delivered to the Sun Oil Company, to which we will refer as Sun, an oil, gas and mineral lease, a true copy of which is alleged to be attached to the original bill. We are particularly interested in the oil feature of the lease.

The bill alleges that by deed executed August 26, 1942, the said R. H. Oswell and his wife granted and conveyed to the complainants the land which is covered by the oil lease to Sun. We note here a discrepancy which neither the bill nor the briefs undertake to explain. That is, that the oil lease, above mentioned, is alleged to be dated September 9, 1942, whereas prior to that time, on August 26, 1942, it is alleged that the lessors deeded the land to the complainants. These complainants are two sons of said lessors. According to those allegations it would appear that R. H. Oswell did not own the land at the time he made the lease, but that it was owned by the complainants. However, complainants recognize the validity of the lease as if it was executed before they obtained title to the land. This could of course result from the fact that the deed was not delivered until after September 9th, although the bill alleges that it was executed on August 26th, and the execution of the deed implies a delivery. The deed does not appear to have been recorded until December 4, 1942, which was after the execution of the lease and, therefore, the complainants may recognize the Sun as an innocent purchaser for value.

Moreover, the bill alleges that after the execution of the lease complainants on October 30, 1950, each separately agreed to an amendment of the lease, and thereby declared it to be in full force. So we will not refer to that situation as being influential on this appeal.

The bill also alleges that on June 27, 1949, these complainants conveyed to respondent Humble Oil and Refining Company, to which we will refer as Humble, an undivided half interest in all the oil, gas and other minerals in the land described in the lease to Sun.

We will not at this time refer to the salient features of the oil lease for there is an important preliminary question which seems to be necessary for decision regardless of the terms of the lease and the conditions in regard to it. For that purpose, it is necessary for us to observe that the bill was filed against Sun and Humble by these complainants who, as we have said, are the grantees of the land, but subject to Sun's lease, and it alleges that Sun had violated the implied and expressed covenants in the lease to such extent that complainants were entitled to a cancellation of the lease to Sun, and it prayed the court to adjudge and decree, (a) that Sun had abandoned and forfeited all its right, title and interest in and to the land described in said lease, see, Shannon v. Long, 180 Ala. 128, 60 So. 273; (b) that the lease be declared void and of no effect; (c) that Sun

and its successors in interest under said lease be enjoined and restrained from asserting any right by virtue of the same, and (d) for general relief. There is no prayer in respect to Humble.

There was an amendment to the bill, as to which it is not necessary to refer immediately. Demurrer was separately filed by Sun and Humble. The cause was submitted on demurrers and the decree merely overruled the same. The appeal was taken by Sun and Humble jointly. There was a severance in the assignment of errors wherein Sun assigned as error the overruling of this demurrer to the bill, and Humble did likewise.

The first question to which we wish to call attention is that, so far as the oil and other minerals are concerned, the complainants and Humble are tenants in common subject to the lease of Sun, whereby the complainants own an undivided half interest in the oil and other minerals as well as all the surface rights, and Humble owns an undivided half interest in the oil and other minerals.

So we have a status whereby tenants in common, owning an undivided half interest in the subject of the lease, seek to have this Court declare the lease abandoned and forfeited in its entirety and declared to be void and of no effect, and that notwithstanding the fact that Humble owning the other half interest in the oil is opposing that result. The complainants do not specifically seek to have the oil lease to Sun abandoned and forfeited in so far as it affects only their undivided half interest in it.

We have had occasion to refer to the rights and interests of tenants in common in respect to a cancellation of a lease, which they had entered into, on account of fraud in procuring its execution. It was shown that a tenant in common, in respect to such a claim, occupies a status which gives him that personal right so far as his interest is concerned without reference to whether the others participate in the suit or not. We refer to the case of Glass v. Cook, 257 Ala. 141, 57 So.2d 505, where we supported that principle. We there justified such equitable relief in favor of some tenants in common to cancel a lease executed by all of them, each for his own interest, for the use of store property, where the contract of lease was obtained by fraud as to the complaining cotenants. In that case one of the cotenants who joined in the lease was alleged to be a party to the fraud and he was made a party respondent, but his interest was not subject to be cancelled. The fraud in procuring the execution of the lease was as to each a personal and severable transaction, and each could, acting for himself, elect either to cancel as to his interest or ratify and confirm it regardless of what the others might elect to do. We also referred to this principle in Cooper v. Peak, ante, p. 167, 61 So.2d 62(11), where there was no indivisible covenant involved.

With reference to the right of cotenants to act severally on account of the breach of covenants by the lessee, it is said in the case of Howard v. Manning, 79 Okl. 165, 192 P. 358, 361, 12 A.L.R. 819, that a "lessor could not fractionize or apportion the *lessee's covenant* by either conveying the lands to several parties as tenants in common or dying and leaving it to a number of heirs. The death of the lessor did not apportion or divide the covenant. The lessee's contract was not altered, modified, or affected by the death of the lessor other than with respect to the payment of the rent. After passing out of the hands of the lessor's administrator (if he had one) each heir had the right to receive his part of the rent, but that did not apportion the indivisible covenants in the lease. Upon the death of the lessor the lessee's covenants in question run to the heirs jointly and indivisibly." On the other hand, it is there also said: "In theory a lease of land by two or more tenants in common is not regarded as one lease by all of them of the premises in its entirety, but as several leases by the tenants in common of their undivided separate and respective shares." But it is pointed out that there is a distinction when the lease is by joint tenants, saying: "If all the joint tenants unite in the execution of a lease, it is regarded in law as but one lease made by one lessor, whereas a lease executed by several tenants

in common is regarded as several leases of their respective and separate shares." In Alabama of course we have no principle of "joint" ownership as distinguished from tenants in common. Title 47, section 19, Code; Hill v. Jones, 65 Ala. 214, 220. But as respects the divisibility of the lessee's covenants it is said: "Under the American authorities the lessee's covenants, unless expressed otherwise, are joint and indivisible under a lease executed jointly by all the tenants in common", also that "one of them, or two representing one interest, could not maintain an action for a breach of it by the lessee", citing Calvert v. Bradley, 16 How. 580, 581, 14 L.Ed. 1066. The clause last above quoted is the subject of much discussion and seems not to apply to the claim of rent. See 12 A.L.R. pp. 828, 830; 34 A.L.R. p. 795.

In the case of Utilities Production Corp. v. Riddle, 161 Okl. 99, 16 P.2d 1092, we find there was a lease executed by Mr. and Mrs. Riddle who were the owners of an eighty acre tract of land. Thereafter they made conveyances of certain interests in the land. The court held, in a suit to cancel the lease for the breach of an implied covenant to develop the operations, that Mr. and Mrs. Riddle being then tenants in common of the oil and mineral interests with others, to whom they had conveyed an interest subject to the lease, could not maintain such a bill without the participation of the other tenants in common with them, and that it could not be done until after all of those tenants in common had joined in a notice to the lessee of an intention to declare a forfeiture of the lease, and demand that the lessee comply with the implied covenant. This conclusion was reached upon the basis of another case in Oklahoma of Hawkins v. Klein, 124 Okl. 161, 162, 255 P. 570. In that case the owner of the land executed an oil and mineral lease, similar to the one we are considering, and then died leaving several heirs. It was held that all the heirs must concur and unite in the election to enforce a forfeiture on account of the breach of the entire and indivisible covenants and that no one of the heirs, by virtue of his cotenancy, is authorized to act for his cotenants in enforcing a for-

feiture. In the Riddle case, as in the Hawkins case, emphasis was placed on the fact that the covenant made by the lessee was entire and indivisible. That was so because at the time of the execution of the lease the lessor was the sole owner and as such made the contract and then died and thereby passed the title to his heirs subject to the lease. The subsequent change in the ownership of the lessor's interest did not thereby affect the indivisibility of the contract between the original lessor and lessee. In the Hawkins case, supra, there was in the lease a requirement of notice similar to the duty when no such requirement is expressed in the lease. One tenant in common gave the notice. It was held to be insufficient because all of them did not unite in it.

Applying the principle of those cases to the present situation, it is easy to hold that the lease when made with complainants' grantor was indivisible as to the lessee's covenants expressed or implied, and that status was not changed because the title to the reversion was broken into shares, if there was no agreement thereafter made between the shareholders and Sun, the lessee.

It is our view however that the indivisibility of the covenants contained in the original lease was severed by reason of the subsequent separate and respective amendments to the lease, to which we have referred. That is to say, that these complainants and Humble, each separately, entered into said amendment to the lease, thereby effecting a severance of the indivisibility of the covenants expressed or implied in the lease. And therefore that the notice required by the lease could be given by complainants and, if given, a suit could be maintained by them in so far as their seperate rights were affected if the covenants expressed or implied by the lessee were not performed in accordance with the restrictions of the lease. If this is accomplished, the result would be that complainants would own a half interest in the oil but subject to a lease, and Humble would own a half interest also subject to Sun's lease. Is there any legal objection to that status? We think not.

Many authorities hold that without the consent of the other tenants in common to that effect each may on his separate account execute an effective lease of oil and other mineral interests in the land. Earp v. Mid-Continent Petroleum Corp., 167 Okl. 86, 27 P.2d 855, 91 A.L.R. 188. The annotation begins on page 205, and shows the difficulty which states have in respect to mineral interests owned by tenants in common. From the annotation it seems that the majority of the states take the view expressed by the Supreme Court of Oklahoma in the last cited case. To the same effect is the case of Prairie Oil & Gas Co. v. Allen, 8 Cir., 2 F.2d 566, 40 A.L.R. 1389. The A.L.R. annotation directs attention to the fact that West Virginia seems to be quite extreme in holding it is waste and a tort for one tenant in common to take oil from the land without the consent of the other. In other cases, as in Kansas, it is held that the separate tenants in common may make separate leases and that each lessee is entitled to the possession of the premises for the purpose of mining oil and other mineral, but neither is entitled to the exclusive possession. Compton v. Peoples Gas Co., 75 Kan. 572, 89 P. 1039, 10 L.R.A.,N.S., 787.

In this State we have likewise given consideration to the respective rights and interests of tenants in common of land as the same affects mining for oil and other mineral. We have cases which hold that if the tenant in common uses the mineral (or timber) in the land for commercial purposes by severing it from the soil and reaping the benefit of such severance, he does not commit a tort but the other tenants in common have a cause of action against him to the extent of a disproportionate use of it. When this is done without the consent of the non-participating tenants in common, we call it waste as other authorities do and justify a recovery in an action of waste at law or an accounting in equity. Section 101, Title 7, Code; Clark v. Whitfield, 218 Ala. 593, 119 So. 631, 633; Clark v. Whitfield, 213 Ala. 441, 105 So. 200.

Therefore, the question which arises in that connection is whether the bill is subject to demurrer in praying for a cancellation of the lease in toto where the allegations of the bill show that if they are entitled to relief it is only to the extent of their undivided half interest in the oil. But we note that, although the bill prays for a cancellation of the lease in its entirety, it also prays in the alternative for such further and different relief as in equity complainants may be entitled to receive.

A bill is not subject to demurrer because one feature of the prayer is for relief to which complainants are not entitled under the allegations of the bill, when other relief under the general prayer is available on those allegations and it is of the same character as that specifically prayed. Wood v. Cantrell, 224 Ala. 294(8), 140 So. 345; Endsley v. Darring, 249 Ala. 381, 31 So.2d 317.

We think that is the status of the bill in the instant suit.

We come now to other important questions which counsel argue. Some of the essential features of the lease are in paragraph two. The consideration is expressed as a present payment of $200, receipt of which is acknowledged and the agreements of the lessee as set forth in the lease, although the lessee does not sign the lease or anyone for the lessee so far as any showing in the record discloses.

The lease does not grant the ownership of the oil and other minerals, but grants and leases to Sun the land described for the purpose of investigating, exploring, prospecting, drilling, mining for and producing oil and other minerals. Rechard v. Cowley, 202 Ala. 337, 80 So. 419.

In said paragraph two of the lease it is also provided that it "shall remain in force for a term of ten years from this date, called primary term, and as long thereafter as oil and other mineral is produced from said land, and as long thereafter as said lessee shall conduct drilling or re-working operations thereon with no cessation of more than sixty consecutive days until production results, and if production results, so long as any such mineral is produced."

Paragraph three of the lease provides for the amount of royalties to be paid and contains other provisions not necessary to recite.

Paragraph four is as follows:

"If operations for drilling a well shall not be commenced on said land on or before one year from date hereof, this lease shall terminate as to both parties, unless or before such anniversary date lessee shall pay or tender to lessor or to lessor's credit in First National Bank at Mobile, Alabama, (which bank and its successors are lessor's agent, and shall continue as depository for rentals payable hereunder, regardless of the changes in ownership of said land or the rentals) the sum of Two Hundred and No/100 Dollars ($200.00) herein called rental, which shall extend for twelve months the time within which such operations may be commenced. In like manner and upon like payments or tenders annually the commencement of such operations may be further deferred for successive periods of twelve months each during the primary term. All payments or tenders of rental may be made by lessee's check or draft mailed to lessor at 858 S. Broad St., Mobile, Alabama, or delivered to lessor, or mailed or delivered to said bank on or before such date of payment".

Paragraph six in pertinent part is as follows:

"In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land not more than one hundred fifty (150) feet from and draining the leased premises, lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances, provided lessee shall not be required to offset any such gas well on adjacent land unless the gas therefrom is marketed; provided, further, in lieu of drilling an offset to such gas well, lessee shall have the option of paying lessor a royalty equal to one-sixteenth of the net revenue derived from the gas sold from such adjacent well, as long as lessee may elect to pay said royalty in lieu of drilling an offset, it will be considered that gas is being produced from the premises

within the meaning of paragraph 2 hereof."

Paragraph nine of said lease to Sun is in the following language:

"The breach by lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease, nor cause a termination or reversion of the estate hereby created, nor be grounds for cancellation hereof in whole or in part. If lessor considers that operations are not any time being conducted in compliance with this lease, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by the lease; but neither the giving of said notice nor the doing of any act by lessee to remedy any breach by lessor shall raise a presumption or be deemed an admission that lessee failed to perform any of its obligations hereunder. After discovery of oil or gas in paying quantities on the premises, lessee shall reasonably develop the acreage retained hereunder, but in discharging this obligation it shall in no event be required to drill more than one well per twenty (20) acres of the area retained hereunder and capable of producing oil, gas or other mineral in paying quantities."

The amendments of the lease, dated October 30, 1950 referred to above, give authority to the lessee to pool the acreage covered by said lease or any portion thereof with other land in their vicinity into units, not exceeding forty acres each. Thereafter, on December 27, 1950, Humble and Sun entered into a pooling agreement creating a pooled unit known as South Carlton Unit No. 1, covering the S.E. ½ of N.W. ¼, Section 15, Township 3 North, Range 2 East; and on or about the 18th day of May, 1951, they entered into another pooling agreement which created a pooled unit known as South Carlton Unit No. 6 and covered the N.E. ¼ of N.W. ¼ of section 15, Township 3, Range 2 East.

The bill then alleges that Humble is the lessee of the land surrounding all those

lands embraced in the lease to Sun, involved in the instant case, and is also the lessee of the oil and mineral in the bed of the Alabama River, and that Humble has been drilling and developing the oil in said adjacent and surrounding lands and has brought in a number of producing oil wells; and also has brought in a well on the South Carlton Unit No. 1, being located on the lands of complainants in Baldwin County, in the instant case. And that all of said wells are producing in paying quantities. The bill further alleges that Humble *proposes to continue the drilling* and development of said adjacent surrounding lands and particularly on said South Carlton Unit No. 6 and on other pooled units, and that if this is done without the concurrent drilling and development of the lands of complainants, their lands would be completely surrounded by wells on adjacent land, draining their land and without any benefit or protection to complainants. The bill further alleges that Sun has wholly failed, neglected and refused to drill and develop the lands of complainants described in said lease, "and your complainants have repeatedly called upon said respondent to drill upon and develop said lands, and particularly to drill an offset well to said producing well in Carlton Unit No. 1, but all of said requests have been denied or refused by said respondent Sun". Complainants also have demanded of Sun to know whether or not it had any plan for the drilling and development of said lands and have been advised by Sun that they have no such plan; that Sun has not taken any steps indicating a purpose to proceed with said drilling and development. That "the continued drilling and development of said adjacent and surrounding lands, as hereinabove shown, and without the concurrent development of complainants' land, will leave your complainants without the benefit of royalties from production from their lands."

■ The law is that without an express stipulation the duty is implied that the lessor in such a contract, if he wishes to declare a forfeiture, should give notice to the lessee of an intention to forfeit it for a failure to comply with the covenants expressed or implied, if any, and call upon him to perform. 3 Summers Oil and Gas, section 469, page 164; Utilities Production Corp. v. Riddle, supra; Hawkins v. Klein, supra; 58 C.J.S., Mines and Minerals, § 184 (3), p. 395. But a contract itself may provide such a requirement. If so, it will take the place of that which the law implies if it is of a different and contradictory nature. Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890, annotation on page 908 et seq.; Warren v. Amerada Petroleum Corp., Tex.Civ.App., 211 S.W.2d 314; Brimmer v. Union Oil Co., 10 Cir., 81 F.2d 437, 105 A.L.R. 454; 21 C.J.S., Covenants, § 32, p. 904.

■ It is our view that the lease to Sun, here in question, contains such an effective requirement which supersedes the notice which the law would otherwise require. So that our problem is whether or not the bill shows a sufficient compliance with that feature of the lease. We have quoted its terms in that respect. We also have quoted the allegations of the bill with respect to the giving of notice. We think the bill does not show a sufficient compliance with the requirements of the lease as to said notice.

We think that conclusion alone requires a reversal of the decree which overruled the demurrer to the bill of complaint, and that without regard to whether Sun has complied with the covenants expressed in the lease and those implied by law in respect to the development of the oil in the land involved.

■■ Another contention made by Sun is that if it had failed to perform its expressed or implied covenants, such failure was waived on two distinct theories, both of which are separately effective to that end. That means as to one theory, that under the terms of the lease when the lessee first paid $200 on September 9, 1942, it had one year from that time in which to perform such duty as the law, as well as the contract, required of it under said lease. And when September 9, 1943 arrived and no steps had been taken by Sun, who then offered to pay a like sum, complainants, if they had wished to seek a forfeiture of the lease by reason of a breach of its implied or expressed covenants, should not have ac-

cepted payment of the $200 on said date, but should have given notice as required by the lease. That situation existed on the anniversary of the lease each year thereafter, and the payment and acceptance of said sum of $200 on said anniversary during the primary term of the lease extended by its terms the right of Sun as the lessee to perform its duty under the lease for another year, and was a waiver of any ground for forfeiture known to the complainants which then may have existed by reason of any past default of the lessee in the performance of its duty. Kern Sunset Oil Co. v. Good Roads Oil Co., 214 Cal. 435, 6 P.2d 71, 80 A.L.R. 453; 3 Summers Oil and Gas, pp. 171–172; Stewart v. Cross, 66 Ala. 22; Zirkle v. Ball, 171 Ala. 568, 54 So. 1000; France v. Ramsey, 214 Ala. 327, 107 So. 816; Gatewood v. Hughes, 214 Ala. 674, 108 So. 562; Bessemer Coal, Iron & Land Co. v. Bullard, 215 Ala. 433, 111 So. 5.

This lease is distinguishable from that involved in Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286, 288, 19 A.L.R. 430. That case states the rule which is applicable to a contract such as we have here, but there not applicable. That is, "that the acceptance of delayed rental precludes the lessor from forfeiting the lease for failure to develop during the term covered by the delayed rental. In such a case the lessor still has the gas and has received the reserved rent for the delay in drilling." The circumstances which relieved the Blair case from the operation of that rule do not obtain with respect to the lease in the instant case. See 24 Am.Jur. 565, section 60, notes 17 and 18.

The allegations of the bill mean that on September 9, 1950, a payment was made by the lessee Sun and received by the complainants of their part of the $200 under said lease. That circumstance, as heretofore stated, was a waiver of any default which had existed up to that time, if there was any, and by express terms in the lease extended the right of the lessee for another twelve months within which to perform its duty which arose under the contract, whether expressed or implied. Within twelve months after September 9, 1950, and on the 2nd day of July, 1951, this bill was filed. So that at the time the bill was filed the lessee Sun was not in such default under the terms of the contract as to justify a forfeiture thereof and that without regard to whether it had failed up to that time to comply with the same.

Another theory is that the parties may by express stipulation waive all past defaults of expressed or implied duties whether they show an abandonment or ground for forfeiture, if there is a difference in the meaning of those terms. Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908. We have shown that complainants, each separately, on October 30, 1950, declared the original lease in full force and effect, and then and there expressly "grant(ed), demise(d), lease(d) and let unto Sun, its successors and assigns, the lands described in said lease, upon all the terms and conditions set out in said lease as hereby amended." Apart from other considerations, that contract had the effect of establishing the lease as thus amended. It extended the duty of the lessee for a year from September 9, 1950. It is without doubt that an abandonment or forfeiture cannot be predicated in a pending suit on a failure of the lessee to comply with his obligations while the suit is pending. 3 Summers Oil and Gas, section 470, p. 171, note 3.

We need not make a study of the law relating to the implied duty of the lessee in such a lease to develop the production of oil in the land and the extent to which a failure to comply with that duty may justify a forfeiture or be an abandonment, since the express stipulations of the lease as amended October 30, 1950, and the payment of the annual rental control the effect of such failure to comply, which had theretofore occurred. A waiver of default applies to covenants which are implied as well as those expressed. So that the lessee was not in default in respect to any such covenant when this bill was filed July 2, 1951.

We need not try to analyze the distinction between an abandonment and forfeiture. For present purposes they both contain, as an element, a default in the performance of a duty arising under the contract. 3

336

Summers Oil and Gas, section 469, pp. 168, 169; Doss Oil Royalty Co. v. Texas Co., 192 Okl. 359, 137 P.2d 934; 3 Summers Oil and Gas, p. 197, n. 69.

 Appellant also insists on his ground of demurrer that the bill does not offer to do equity. But such an offer is not necessary unless the bill shows some duty on the part of complainants as a condition to the granting of relief. Davis v. Anderson, 218 Ala. 557, 119 So. 670; Sumners v. Jordan, 220 Ala. 402, 125 So. 642; Sims Chancery Practice, section 292, p. 185. The cases cited by appellant showed such a duty on the part of complainant. Shamblee v. Wilson, 233 Ala. 164, 170 So. 769; Harris v. Nichols, 223 Ala. 58, 134 So. 798. These cases involved a quieting of title or cancellation of some instrument in which complainants were due to make restitution or satisfy some claim of defendants. The rules there appertaining are set forth in cases digested in 4 Ala.Digest 144, 145, Cancellation, ☞37(4), Pocket Part; 16 Ala.Dig. 517, 518, Quieting Title, ☞34(4); Grayson v. Roberts, 229 Ala. 245, 156 So. 552. We see nothing in this bill which requires an offer to do equity.

Appellees allege in their amendment to the bill of complaint that the amendments of October 30, 1950 to the lease by complainants and November 9, 1950 by Humble are void on their face because the names of the lessors do not appear as such in the body of those instruments. They are signed each separately, but in the body of the lease no name appears as a lessor executing it, but the following words are used: "the undersigned, in severalty or in separate tracts or in indivision" and "the undersigned owners of the above described land and mineral." The principle relied on is that where an instrument in writing purports on its face to be made by certain parties named therein, and the signature of a party not named appears signed to the instrument, it is not the contract of the last named party. Brown v. O'Byrne, 153 Ala. 621, 45 So. 129. But when the body of the instrument does not purport to set out the names of the grantors, all the signers are to be considered as such. Bowles v. Lowery, 181 Ala. 603,

62 So. 107; St. Clair Springs Hotel Co. v. Balcomb, 215 Ala. 12, 108 So. 858. We think that principle is here controlling and that those contracts are not void on that claim.

 As we have said, there is no prayer as to Humble. But being a cotenant with complainants, Humble is a proper party to enable it to enforce such rights as it may desire to do in respect to the subject of the litigation. See Wood v. Wood, 134 Ala. 557, 562, 33 So. 347. A decree in equity may be against any one or more defendants. Equity Rule 67. Humble has seen fit to resist the relief sought by complainants. That relief primarily is to cancel the lease in its entirety, including Humble's interest. To that extent Humble is a necessary party. Since we think the bill is subject to Sun's demurrer, it is also subject to Humble's demurrer. So that, the decree is reversed on the assignments of Sun and Humble, separately.

Reversed and remanded.

All the Justices concur.