OPINE TIMBER COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1358-73.    Filed July 30, 1975.

*Charles B. Bailey, Jr.,* for the petitioner.
*Robert W. West,* for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal corporate income tax for its fiscal years ending September 30, 1969, 1970, and 1971 in the amounts of $70,057.43, $53,814.85, and $20,644.72, respectively.

The issues for our decision are (1) whether petitioner's election in 1958 to be taxed as a small business corporation under section 1372, I.R.C. 1954,[1] was terminated and, if so, the year for which the termination was effective; (2) whether petitioner's election in 1974 to be taxed as a small business corporation was valid and, if so, was this election retroactive to the years here in issue; and (3) whether respondent improperly made a second audit of petitioner's tax liability for the year 1969.

All of the facts have been stipulated and are found accordingly.

Opine Timber Co., Inc. (petitioner), an Alabama corporation, had its principal offices in Jackson, Ala., at the time of the filing of its petition in this case. Petitioner's principal business is the sale of standing timber. Petitioner filed tax returns for a fiscal year ending September 30. It filed United States small business corporation tax returns (Form 1120-S) for its years ending September 30, 1959 through 1971.

On November 5, 1958, petitioner filed with the District Director of Internal Revenue, Birmingham, Ala., a Form 2553 properly executed to be taxed as a small business corporation. The parties have stipulated and respondent in his answer admitted that this election was valid.[2]

On and after November 5, 1958, petitioner has not had more than 10 stockholders at any one time; has not had as a stockholder a person other than an estate who was not an individual or who was a nonresident alien; has not had more than one class of stock; and has not been a member of an affiliated group of corporations under section 1504.

In April 1961, petitioner executed a standard form of oil, gas, and mineral lease to John M. Gray, Jr. (Gray), covering approximately 2,960½ acres of land in Clarke County, Ala. This lease (the agreement) provided in part as follows:

---

[1] All references are to the Internal Revenue Code of 1954, unless otherwise noted.

[2] It is apparent, as respondent points out in a footnote in his brief, that this stipulation and admission may be an incorrect legal conclusion since sec. 1372(c) requires the election to be filed during the first month of the corporation's taxable year or the month preceding the first month with exceptions not here relevant. See *Joseph W. Feldman,* 47 T.C. 329, 333 (1966); *William Pestcoe,* 40 T.C. 195, 198 (1963).

1. Lessor * * * hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Clarke County, Alabama, to-wit:

* * *

2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder.

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a gas well is not sold or used, Lessee may pay as royalty $100.00 per well per year and if such payment is made it will be considered that gas is being produced within the meaning of Paragraph 2 hereof, and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur mined and marketed, the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

* * *

5. If operations for drilling are not commenced on said land or on acreage pooled therewith as provided on or before one year from this date the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in First Bank of Grove Hill Bank at Grove Hill, Alabama (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Two Thousand Nine Hundred Sixty and 50/100 Dollars ($2960.50), (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of Lessee mailed or delivered to Lessor or to said bank on or

before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time or times execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases.

\* \* \*

8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to their heirs, successors and assigns: but no change or division in ownership of the land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee; and no change or division in such ownership shall be binding on Lessee until thirty (30) days after Lessee shall have been furnished by registered U.S. mail at Lessee's principal place of business with a certified copy of recorded instrument or instruments evidencing same. In the event of assignment hereof in whole or in part liability for breach of any obligation hereunder shall rest exclusively upon the owner of this lease or of a portion thereof who commits such breach. In the event of the death of any person entitled to rentals hereunder, Lessee may pay or tender such rentals to the credit of the deceased or the estate of the deceased until such time as Lessee is furnished with proper evidence of the appointment and qualification of an executor or administrator of the estate, or if there be none, then until Lessee is furnished with evidence satisfactory to it as to the heirs or devisees of the deceased, and that all debts of the estate have been paid. If at any time two or more persons be entitled to participate in the rental payable hereunder, Lessee may pay or tender said rental jointly to such persons or to their joint credit in the depository named herein; or, at Lessee's election, the proportionate part of said rental to which each participant is entitled may be paid or tendered to him separately or to his separate credit in said depository; and payment or tender to any participant of his portion of the rentals hereunder shall maintain this lease as to such participant. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratable according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. If six or more parties become entitled to royalty hereunder, Lessee may withhold payment thereof unless and until furnished with a recordable instrument executed by all such parties designating an agent to receive payment for all.

Petitioner received from Gray pursuant to the agreement the sum of $2,960.50 during each of its taxable years ending September 30, 1961, 1963, and 1964, and the sum of $2,958.50 during each of its taxable years ending September 30, 1965, 1966, 1967, and 1968. Petitioner reported such amounts as rents on its U.S. Small Business Corporation return for each of these fiscal years. Petitioner additionally received the amount of $42,258.90, mostly consisting of gain from the sale of cattle and standing timber, during its taxable year ending September 30, 1961; the amount of $3,620.90, mostly consisting of gain from the sale of standing timber, during its taxable year ending September 30, 1963; and the amount of $72.25 during its taxable year ending September 30, 1964. During its fiscal years ending September 30, 1965, 1966, 1967, and 1968 the only income received by petitioner was the payments from Gray.

Petitioner received a letter from respondent dated January 19, 1972, advising it that its small business corporation income tax return for the fiscal year ended September 30, 1969, had been accepted as filed.

Petitioner's income tax return for its taxable year 1969 was subsequently reopened for examination. This reopening was authorized in a "Reopening Memorandum" approved by an Internal Revenue Service assistant regional commissioner (audit) based on a request by a revenue agent indicating that no inspection of petitioner's books was required for the reopening.

Respondent in his notice of deficiency to petitioner dated November 27, 1972, for its taxable years ending September 30, 1969, 1970, and 1971, informed petitioner of the reopening of the year 1969 and explained that the deficiencies determined were because petitioner's election under section 1372(a) had been terminated effective for the taxable year ending September 30, 1968, since during that taxable year all of petitioner's gross receipts consisted of passive investment income in contradiction of section 1372(e)(5).

On May 31, 1974, petitioner filed an election, Form 2553, to be treated as a small business corporation under section 1372(a), along with a stockholders' statement of consent to the election, with the Internal Revenue Service Center, Chamblee, Ga., and with the District Director of Internal Revenue, Birmingham, Ala., to be effective October 1, 1968, in the event that its prior election in 1958 was terminated.

Section 1372(e)(5)[3] provides that an election made by a corporation to be taxed as a small business corporation shall terminate as of the beginning of the taxable year in which such corporation has gross receipts more than 20 percent of which is "passive investment income." The term "passive investment income" as defined in section 1372(e)(5)(C) includes gross receipts derived from rents. Section 1.1372-4(b)(5)(vi), Income Tax Regs.,[4] defines "rents" as used in section 1372(e)(5) as amounts received "from the use of, or rights to use, property."

The parties recognize that for the taxable year ending September 30, 1968, petitioner's income consisted solely of "delay rentals" paid pursuant to paragraph 5 of the oil and gas lease and that if such payments were "rents" within the meaning of section 1372(e)(5), petitioner's election as a small business corporation if it had not previously terminated would terminate

---

[3] Sec. 1372(e)(5)(A) and (C) provides as follows:

(5) PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

\* \* \*

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Gross receipts derived from sales or exchanges of stock or securities for purposes of this paragraph shall not include amounts received by an electing small business corporation which are treated under section 331 (relating to corporate liquidations) as payments in exchange for stock where the electing small business corporation owned more than 50 percent of each class of the stock of the liquidating corporation.

[4] Sec. 1.1372-4(b)(5)(vi), Income Tax Regs., provides as follows:

(vi) *Rents.* The term "rents" as used in section 1372(e)(5) means amounts received for the use of, or right to use, property (whether real or personal) of the corporation. The term "rents" does not include payments for the use or occupancy of rooms or other space where significant services are also rendered to the occupant, such as for the use or occupancy of rooms or other quarters in hotels, boarding houses, or apartment houses furnishing hotel services, or in tourist homes, motor courts, or motels. Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only. The supplying of maid service, for example, constitutes such services; whereas the furnishing of heat and light, the cleaning of public entrances, exits, stairways and lobbies, the collection of trash, etc., are not considered as services rendered to the occupant. Payments for the use or occupancy of entire private residences or living quarters in duplex or multiple housing units, of offices in an office building, etc., are generally "rents" under section 1372(e)(5). Payments for the parking of automobiles ordinarily do not constitute rents. Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments.

for such taxable year since more than 20 percent of its gross receipts would constitute proscribed passive investment income.

Respondent contends that the oil and gas lease executed by petitioner created a leasehold interest in the lessee, Gray, under Alabama law, relying on *Sun Oil Co. v. Oswell,* 258 Ala. 326, 62 So. 2d 783 (1953); *Rechard v. Cowley,* 202 Ala. 337, 80 So. 419 (1918); *Miller v. Woodard,* 207 Ala. 318, 93 So. 28 (1922); and that Gray's payment of delay rentals, pursuant to the lease agreement, was rent within the meaning of section 1372(e)(5), relying on *Bayou Verret Land Co. v. Commissioner,* 450 F. 2d 850 (5th Cir. 1971), affg. in part and revg. and remanding in part 52 T.C. 971 (1969); *Houston Farms Development Co. v. United States,* 131 F. 2d 577 (5th Cir. 1942); *Commissioner v. Wilson,* 76 F. 2d 766 (5th Cir. 1935).

It is petitioner's position that the payments it received under the lease do not constitute rents within the meaning of section 1372(e)(5) since they were not paid for the use and occupancy of property, relying on *Swank & Son, Inc. v. United States,* 362 F. Supp. 897 (D. Mont. 1973), and *Alphin v. Gulf Refining Co.,* 39 F. Supp. 570 (W.D. Ark. 1941), but that the payments were for the purchase or option to purchase the oil and gas in place or for the option of deferring commencement of drilling operations or the commencement of production for each year after the first year during the 10-year primary term of the lease.

We do not look to Alabama law to determine the legal effect of the agreement.[5] Whether under Alabama law a mineral agreement created a landlord-tenant relationship so that Gray had the right to use the land as a tenant, transferred the title to the minerals in place so that Gray had a present vested interest in the

---

[5] We note that the agreement created under Alabama law a leasehold interest in Gray since the unambiguous terms of the agreement evidenced that the intent of the parties thereto was not to convey any title to the minerals in situ but to create a leasehold interest. There were no words of "bargain and sale" to indicate the conveyance of any present interest in the minerals. *State v. Roden Coal Co.,* 197 Ala. 407, 73 So. 5, 7 (1916). The agreement granted, leased, and let certain lands for the purpose of investigating, of exploring, of drilling and producing minerals, of laying pipe, of building roads, tanks, and other structures thereon to produce, save, treat, transport, and own said minerals, and of housing employees. The agreement in its entirety, reflecting the parties' intent, conferred upon Gray the right of limited entry to explore for minerals on petitioner's lands and to produce and take the minerals when found in consideration of the royalty payments provided for in the agreement. The right of Gray to build certain structures and to own the minerals is compatible with his holding a leasehold interest under Alabama law insomuch as his ownership of the minerals is predicated upon the severance of the minerals from the leasehold. See *Miller v. Woodard,* 207 Ala. 318, 93 So. 28 (1922); *Rechard v. Cowley,* 202 Ala. 337, 80 So. 419 (1918).

severed mineral estate, or conveyed some other property interest, the kind of property interest conveyed by the agreement under Alabama law does not control the application of a Federal taxing statute. State law may control only when the Federal taxing act, by express language or necessary implication, makes its own operation dependent upon State law. *Burnet v. Harmel,* 287 U.S. 103, 110 (1932). Section 1372(e)(5), in providing that "rents" are part of passive investment income, did not imply that local law should control what items are considered as "rents." There is nothing in the legislative history of section 1372(e)(5) to indicate what was intended to be considered "rents" as used therein.[6]

Petitioner does not argue that the definition of "rents" in respondent's regulations as amounts received for the use of, or right to use, the corporate property whether real or personal (sec. 1.1372-4(b)(5)(vi), Income Tax Regs.) is improper and makes no contention that the regulation is invalid. The regulation is reasonable and plainly consistent with the revenue statute and comports with the generally understood meaning of "rents." If reference to the definition of rents under the personal holding company provisions (sec. 534(a)(2)) is appropriate[7] rents are

---

[6] S. Rept. No. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1010; S. Rept. No. 1007, 89th Cong., 2d Sess. (1966), 1966-1 C.B. 527, 532; S. Rept. No. 91-1535 (1970), 1971-1 C.B. 614.

[7] *House v. Commissioner,* 453 F. 2d 982 (5th Cir. 1972), revg. a Memorandum Opinion of this Court, held that "passive investment income" in sec. 1372(e)(5) means "personal holding company income" as defined in sec. 543(a). This Court has specifically rejected this definition. *I. J. Marshall,* 60 T.C. 242 (1973), affd. 510 F. 2d 259 (10th Cir. 1975). However, since an appeal in the instant case would lie to the U.S. Court of Appeals for the Fifth Circuit, this Court would, if the case were considered "squarely in point" accept this definition in this case. However, there is no basic inconsistency in the definition of "rents" in respondent's regulations under sec. 1372(e)(5) and the definition of "rents" for the purpose of the personal holding company tax. Petitioner does not contend that the provisions of sec. 543(a)(2) respecting "personal holding company income" are applicable in this case. Sec. 543(a)(2) provides:

(2) RENTS.—The adjusted income from rents; except that such adjusted income shall not be included if—

(A) such adjusted income constitutes 50 percent or more of the adjusted ordinary gross income, and

(B) the sum of—

(i) the dividends paid during the taxable year (determined under section 562),

(ii) the dividends considered as paid on the last day of the taxable year under section 563(c) (as limited by the second sentence of section 563(b)), and

(iii) the consent dividends for the taxable year (determined under section 565),

equals or exceeds the amount, if any, by which the personal holding company income for the taxable year (computed without regard to this paragraph and paragraph (6), and computed by including as personal holding company income copyright royalties and the adjusted income from mineral, oil, and gas royalties) exceeds 10 percent of the ordinary gross income.

The reason that petitioner makes no contention in this regard may be that in its fiscal

"compensation (however designated) for the use, or right to use, property of the corporation." Sec. 1.543-1(b)(10), Income Tax Regs. Rents for life insurance income have been referred to as "compensation for the right to use property which is fixed and certain in amount and payable periodically over a fixed period regardless of the extent of the use of the property." *Campbell v. Great National Life Insurance Co.*, 219 F. 2d 693, 696 (5th Cir. 1955). See *Duffy v. Central R. Co.*, 268 U.S. 55 (1925).

Considering all of these definitions of "rents" we must determine whether the payments received by petitioner were for the use of or the right to use its land, and this determination is not governed by the characterization of the property interest conveyed by the agreement under local law.

The agreement executed by petitioner permitted Gray to go onto and under petitioner's land and to get the minerals there if he could find them and to take them away for a period of 10 years from a certain day in April 1961, and as long thereafter as minerals were produced. However, if drilling operations were not commenced on the land on or before a year from that date, the agreement terminated unless on or before such time, Gray paid petitioner the amount of $2,960.50, termed "rental," to cover the privilege of deferring commencement of drilling operations for 12 months. Upon subsequent anniversary dates of the agreement during the 10-year period, the commencement of drilling operations could be further deferred by the payment of "rental" for another 12-month period. The "rental" could be proportionately reduced under the terms of the agreement upon Gray's releasing his rights under the agreement with respect to any portions of the lands covered under the agreement. Further, should Gray assign to others his rights under the agreement to separate parts of the lands covered thereunder, the "rentals" payable became an obligation of the assignees in proportion to their surface areas.

---

year 1963, the year petitioner contends its election terminated, if its payments from Gray were "rents," these payments were less than 50 percent of its adjusted gross income. In any event, since no point is made anywhere in this case by petitioner that its election is not terminated if the payments received by it from Gray are "rents" under sec. 1372(e)(5), we have given no consideration to any possible application of sec. 543(a)(2) just as we have not considered whether petitioner's original election on Nov. 5, 1958, was valid but accepted the stipulation of the legal conclusion of the election's validity by the parties.

Petitioner argues in effect that this mineral agreement was really a sale out of a part of the land and the payments made were for the purchase of that part. Respondent argues that the agreement permitted Gray to go onto petitioner's property and to use the land and the payments were recompense for that privilege.

Under the terms of this agreement Gray or his assignee had to do one of three things: He had to drill, pay rentals, or forfeit his rights under the agreement. If he drilled and found minerals, he neither paid rentals nor forfeited his rights, but he paid the royalty provided for in the agreement. If he did not drill, but retained his rights, he had to pay rentals. If he neither drilled nor paid rentals, he forfeited his rights. See *Phillips Petroleum Co. v. Taylor,* 116 F. 2d 994, 995-996 (5th Cir. 1941), cert. denied 313 U.S. 565 (1941). The "rentals" under the agreement, commonly referred to as delay rentals, served the following two functions: (1) The reimbursement of petitioner for the loss it suffered on account of the absence of production which included the possibility of the migration of the oil from under its lands; and (2) the maintenance of the rights of Gray under the agreement for the succeeding year without further payments and without the commencement of drilling which was necessary to fulfill his obligation under the agreement to develop the mineral lands. See *White Castle Lumber Co. v. United States,* 481 F. 2d 1274 (5th Cir. 1973); sec. 1.612-3(c)(1), Income Tax Regs.

In *J. T. Sneed, Jr.,* 33 B.T.A. 478, 482 (1935), depletion on delay rentals was denied, such payments being defined as follows:

> The payments in question are in the nature of liquidated damages or penalties for failure to drill upon, or exploit, the properties. They are made and are required, not for extracting the oil, gas, or minerals, but for failing to do so. They merely "cover the privilege of deferring commencement of a well", but are not required to be made if the property is developed.
>     * * *
> It is more "in the nature of damages" for the lessee's failure to exploit the property.

Cf. *James Lewis Caldwell McFaddin,* 2 T.C. 395, 404 (1943); *Alice G. K. Kleberg,* 43 B.T.A. 277, 293-294 (1941). Moneys paid because of delay to produce oil, and to maintain control of the lease, are in the nature of rent, involve no depletion of the oil reserve, and are entitled to no depletion deduction. *Houston*

*Farms Co. v. United States,* 131 F. 2d 577, 579 (5th Cir. 1942); *Bennett v. Scofield,* 170 F. 2d 887 (5th Cir. 1948).

In *Olen F. Featherstone,* 22 T.C. 763, 771 (1954), these delay rentals are defined as fixed sums paid in advance to secure for the payor the right to hold the lease for the succeeding year or designated period without the necessity of drilling wells or making further payments, except royalties, in the event that minerals are produced. The payment is not deemed compensation for the mineral extracted from the soil in any of these cases. The theory of these cases is that a lessee retains an economic interest in the oil and gas in place by paying a delay rental.

In *Commissioner v. Wilson,* 76 F. 2d 766 (5th Cir. 1935), the Court of Appeals in determining whether delay rentals derived from separate property were separate or community property under Texas law stated delay rentals "accrue by the mere lapse of time * * *. They do not depend on the finding or production of oil or gas and do not exhaust the substance of the land * * * the delay rental is not paid directly or indirectly for oil to be produced, but is for additional time in which to utilize the land." See also *Lambert v. Jefferson Lake Sulphur Co.,* 236 F. 2d 542, 546 (5th Cir. 1956).

Petitioner was recompensed by the payments made to it by Gray for the rights that Gray acquired under the agreement. These rights primarily were the privilege of exploiting the land for the production of minerals for a 1-year period, that is, exploring and drilling and, if any minerals were found, producing and mining such minerals subject to the payment of royalties thereon to petitioner. The purpose of the agreement was to have Gray, within 1 year from the execution of the agreement, explore and develop the land for the production of minerals. Petitioner and Gray both would profit from this production to the extent of the share of each in the minerals produced. Under the facts here, there was no drilling operation or production and to extend his rights under the agreement, including the possible ultimate ownership of the minerals, Gray annually paid rentals to petitioner. However, these rental payments did not have to be made to pass ownership of the minerals since such ownership would have passed in any event under the agreement if drilling had begun prior to April 1962, and minerals had been subsequently produced. These payments merely retained Gray's economic interest in the minerals under the agreement.

Consequently, the payments to petitioner were consideration for the preservation of the exclusive right to enter upon the land for the purpose of exploring it and of drilling for an additional year. Drilling was necessary to obtain ownership of the minerals in the economic sense and rentals were paid basically to postpone the right and obligation to enter upon the land and to drill rather than for the right to presently own the minerals in place or to own the minerals in the future upon their severance from the leasehold. The payments here at issue were received by petitioner for Gray's right to use its real property and we conclude that such payments constitute rent within the meaning of section 1372(e)(5).[8]

Since over 20 percent of petitioner's income in its fiscal year ended September 30, 1963, was from payments from Gray, we conclude that the election to be taxed under section 1372(a) terminated in that year in accordance with the provisions of section 1372(e)(5). Petitioner takes this position as an alternative and respondent on brief does not argue to the contrary. Clearly under the statute its fiscal year 1963 is the year petitioner's election terminated.

Petitioner contends that if we agree with its contention that its election to be taxed under section 1372(a) was terminated under the provisions of section 1372(e)(5) for its fiscal year 1963, then it had the right under section 1372(f)[9] to again elect to be taxed under section 1372(a) at the beginning of its fiscal year 1968 and that it did so elect by filing an election on May 31, 1974 "to be effective for the taxable year beginning" October 1, 1968. Section 1372(c)(1)[10] provides that an election to be taxed as a small

---

[8] Petitioner's reliance on *Swank & Son, Inc. v. United States*, 362 F. Supp. 897 (D. Mont. 1973), is misplaced. That case held that a bonus, the consideration paid for the execution of a mineral lease, was neither royalty nor rent within the meaning of sec. 1372(e)(5). Cf. *Bayou Verret Land Co. v. Commissioner*, 450 F. 2d 850 (5th Cir. 1971), affg. in part and revg. in part 52 T.C. 971 (1969), which held that a lease bonus was the type of passive investment income proscribed under sec. 543 and concluded that it was royalty under sec. 543(a)(8). The case of *Alphin v. Gulf Refining Co.*, 39 F. Supp. 570 (W.D. Ark. 1941), involves an issue with respect to rights to minerals. The comments of the court as to the nature of "delay rentals" in that case are not helpful in resolving the issue here involved.

[9] SEC. 1372(f). ELECTION AFTER TERMINATION.—If a small business corporation has made an election under subsection (a) and if such election has been terminated or revoked under subsection (e), such corporation (and any successor corporation) shall not be eligible to make an election under subsection (a) for any taxable year prior to its fifth taxable year which begins after the first taxable year for which such termination or revocation is effective, unless the Secretary or his delegate consents to such election.

[10] SEC. 1372(c)(1). IN GENERAL.—An election under subsection (a) may be made by a small business corporation for any taxable year at any time during the first month of such taxable year, or at any time during the month preceding such first month. Such election

business corporation may be made for any year at any time during the first month of such year or the month preceding the first month. This provision has been strictly construed. *Joseph W. Feldman,* 47 T.C. 329 (1966). Petitioner contends, however, that because respondent did not notify it that its election was terminated until November 27, 1972, it should be entitled to file a retroactive election since otherwise the result is "an exorbitant increase in the amount of taxes to be paid by petitioner." It is well settled that by accepting a return as filed or the handling of an item on a return by a taxpayer in prior years, respondent is not prohibited from properly determining the tax for subsequent years when he discovers the error. *George R. Tollefsen,* 52 T.C. 671, 681 (1969), affd. 431 F. 2d 511 (2d Cir. 1970), and cases there cited. The fact that petitioner did not recognize that its election terminated in its fiscal year 1963 until notified by respondent that the election terminated in its fiscal year 1968, does not operate to allow it to make a retroactive election to be taxed under section 1372(a) for its taxable years here in issue. See *Alfred N. Hoffman,* 47 T.C. 218, 236-237 (1966), affd. per curiam 391 F. 2d 930 (5th Cir. 1968). We hold that petitioner's "retroactive election" filed May 31, 1974, is ineffective as to the years here in issue.

Petitioner's final contention is that because respondent initially sent it a letter accepting its return as filed for its fiscal year 1969, he was not authorized to later determine a deficiency for that year. Petitioner cites no cases in support of its position and its position is clearly contrary to numerous court decisions. *Lucy M. Lawton,* 16 T.C. 725, 727 (1951), and cases there cited. Petitioner does not allege or argue collateral estoppel. No "second inspection" of petitioner's books and records is alleged, nor does petitioner rely on section 7605(b). Petitioner relies merely on respondent's own internal procedures that provide for reopening a case after a "no change letter" is sent to a taxpayer only with approval of specified officials. The record here shows that this approval was obtained before petitioner was sent a notice of deficiency for its fiscal year 1969. See *Rife v. Commissioner,* 356 F. 2d 883 (5th Cir. 1966), affg. on the sec. 7605 issue 41 T.C. 732

shall be made in such manner as the Secretary or his delegate shall prescribe by regulations.

(1964). We hold respondent's determination of a deficiency in petitioner's tax for its fiscal year 1969 valid.

*Decision will be entered for the respondent.*