ESTATE OF JEREMIAH ROBERTS DOWNING, EVERETT MORSE, FRANK G. NEWHALL AND JERE R. DOWNING, TRUSTEES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13492.   Promulgated July 6, 1928.

*Arthur T. Johnson, Esq.*, for the petitioners.
*Albert Lisenby, Esq.*, for the respondent.

### OPINION.

ARUNDELL: In computing the profit realized by the estate on the sale of 1,190 shares of stock of J. R. Downing Co. to the Porter-Milton Ice Co., the respondent used a March 1, 1913, value for the stock of $131,102.37. The petitioners assert that there were no sales of the shares at or about March 1, 1913, and that their value can be determined only by a resort to the assets of the corporation, which assets they claim were on March 1, 1913, worth $171,181.50, including good will of a value of $40,000.

From the testimony of petitioners' two witnesses, Jere R. Downing, president of J. R. Downing Co. subsequent to the death of J. R. Downing, and Frank G. Newhall, a banker in the Brighton and Newton districts with many years of experience in valuing property for the purpose of making loans, we have found that the assets of the corporation, except the stable, had a fair market value or price at March 1, 1913, of $110,500.56. With the exception of a difference of $699.44 in the value of the lands owned by the corporation at its Brighton plant, its witnesses having approximated the amount instead of computing it accurately according to their valuation of 3 cents per square foot, our figures correspond with the uncontradicted opinion of the two witnesses presented by the petitioners as to the value of the property.

The petitioners' witnesses testified that the March 1, 1913, value of the stable was equal to its construction cost in 1912 of $31,417.28. The building was designed for the accommodation of 100 horses, but due to the fact that the corporation did not need or use in its business more than 50 horses, the stable was not outfitted for the care of more than that number of animals. The corporation started to replace its horse-drawn ice wagons with trucks as early as 1913, but the construction of the building was such that in 1913 it could not have converted it into a garage without considerable expense for metal lathe and cement plaster, and because of the fact that the property was situated about a mile from any community having residents owning automobiles, the building could not have been profitably employed as a public garage. In 1920 it would have cost more to convert the building into a garage than its construction cost in 1912. At the hearing Jere R. Downing volunteered the information that he " thought it was a very foolhardy piece of business for my father to go ahead and build such a barn as that was." In valuing the stable as of March 1, 1913, at an amount equal to its cost in 1912,

neither witness predicated his opinion on any factor other than cost, or made any allowance for depreciation. We have frequently held that valuations based upon cost have little evidentiary value without corroborative evidence. *Kinsman Transit Co.*, 1 B. T. A. 552; *Rockford Malleable Iron Works*, 2 B. T. A. 817; and *Hudson River Woolen Mills*, 9 B. T. A. 862. The evidence before us here strongly indicates that the stable was worth on March 1, 1913, considerably less than its actual construction cost. We have, therefore, not assigned any value to the stable in determining the net assets of the corporation on March 1, 1913.

The petitioners' claim of a valuation of $40,000 for good will is predicated principally upon a so-called right to the exclusive retail sale of ice in the district in which J. R. Downing Co. transacted business. The territory was not protected by contract with other ice dealers. The most that can be said of this contention of the petitioners is that it was the custom or practice of retailers of ice in and around Boston not to invade the territory of each other. This practice did not in any sense give the Downing Company a monopoly over the territory it served and there was nothing to prevent any person from entering the territory in competition with the corporation. The various routes maintained by the corporation were similar in many respects to laundry routes and the circulation of newspapers, which, when properly proven, have a value. *Pioneer Laundry Co.*, 5 B. T. A. 821, and *Herald-Despatch Co.*, 4 B. T. A. 1096.

It was admitted at the hearing by counsel for the petitioner that the earnings of the corporation in 1911 and 1912 do not of themselves justify any good will valuation. The two interested witnesses presented by the petitioners gave as their opinion that the corporation's good will at March 1, 1913, had a value of $40,000. We can not accept the categorical opinion of Jere R. Downing, lacking, as it does, any basis whatever, and Frank G. Newhall, the other witness, failed to show sufficient familiarity with the business and knowledge of the factors essentially necessary to form an opinion on the value of good will to entitle his valuation to any weight.

The petitioners have proven net assets of the corporation back of its capital stock of $107,597.76, which amount is approximately $30,000 less than the sum determined by the respondent in connection with his valuation of the stock in question. There were no sales made of the corporation's stock prior to sale made by the petitioners in 1920 and no evidence was offered to prove that the stock had a value aside from the assets back of it. As a matter of fact, the petitioners are relying altogether on the corporation's worth to determine the value of its stock.

The petitioners have not only failed to prove that the March 1, 1913, value of the net assets of J. R. Downing was greater than the amount used by the respondent as a basis for determining the value of the stock in question, but have not overcome the presumption existing in favor of the correctness of the respondent's determination of the fair market value or price of the stock at March 1, 1913.

From the opening statement made at the hearing by counsel for the petitioners, we have learned that $\frac{85}{194}$ of the profit realized on the sale of the stock was returned as income in 1920, $\frac{50}{194}$ in 1921, and the balance in 1922, when the note was paid in full. It is claimed by the petitioners that the respondent erred in declining to permit them to return profit on an installment basis. With this contention we do not agree. Section 212 (d) of the Revenue Act of 1926, which section 1208 of the same Act provides shall be retroactively applied in computing income under the provisions of the Revenue Acts of 1917, 1918, and 1921, reads as follows:

Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of real property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price. In the case (1) of a casual sale or other casual disposition of personal property for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed one-fourth of the purchase price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this subdivision. As used in this subdivision the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

The initial payment of $50,000 was almost 27 per cent of the sales price of the stock and the total of the payments received in 1920 was in excess of 33 per cent. No error was committed by the respondent in refusing to permit the petitioners to return the profit realized on the sale on an installment basis. See *George Antonoplos*, 3 B. T. A. 1236, and *Gertrude H. Sweet*, 8 B. T. A. 404.

No competent evidence was offered to prove that the cash value of the note was not equal to the face amount thereof, less any payments made.

The petitioners did not offer any testimony in support of their claim that the respondent erred in not deducting as an expense incurred in making the stock sale, an amount alleged to be in the sum of $10,000.

*Judgment will be entered for the respondent.*