W. T. GRAHAM AND KATE GRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent GRAHAM PLOW, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graham v. Commissioner
Docket Nos. 6460-67, 6461-67.
United States Tax Court
T.C. Memo 1976-295; 1976 Tax Ct. Memo LEXIS 107; 35 T.C.M. (CCH) 1315; T.C.M. (RIA) 760295; September 21, 1976, Filed Williard A. Herbert, for the petitioners. W. John Howard, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge John H. Sacks pursuant to the provisions of section 7456(c) of the Internal Revenue Code and the Tax Court Rules of Practice and Procedure. His report *109 was filed on March 24, 1976. Subsequently the respondent filed exceptions with the Court, and the petitioners filed a reply thereto. Having considered the exceptions, we agree with and adopt the opinion of Special Trial Judge Sacks, with minor modifications, as set forth below. OPINION OF THE SPECIAL TRIAL JUDGE SACKS, Special Trial Judge: In these consolidated [1] cases respondent determined deficiencies in the Federal income tax of petitioners for the years and in the amounts following: Docket
Taxable Year Petitioner
Number
Ending
Deficiency
W. T. Graham
12/31/63
$171,803.79
and
6460-67
12/31/64
35,871.22
Kate Graham
12/31/65
31,695.30
Graham Plow,
Inc.
6461-67
3/31/61
15,315.65
Other issues having been resolved by agreement of the parties, those remaining for decision are (1) whether respondent erred in determining that the fair market value of certain oil and gas leases transferred by W. T. Graham on March 30, 1963 to Graham Plow, Inc., a corporation of which he was the controlling shareholder, in exchange *110 for the cancellation of indebtedness owed by him to the corporation was less than the amount of that indebtedness, with the result that he received a taxable dividend in 1963 within the ambit of section 301(c) of the Internal Revenue Code of 1954, [2] and, (2) whether respondent correctly determined that a salary paid by Graham Plow, Inc. to its vice-president, Kate Graham, during the fiscal years 1961 and 1962 in excess of $3,600 for each year was unreasonable and therefore nondeductible as an ordinary and necessary expense of carrying on its business within the purview of section 162(a)(1) of the Code. [3]
*111 I. FINDINGS OF FACT Some of the facts have been stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. W. T. Graham and Kate Graham are husband and wife who resided in Amarillo, Texas at the time of the filling of their petition herein. Their joint Federal income tax returns for the taxable years 1963, 1964, and 1965 were filed with the District Director of Internal Revenue, Dallas, Texas. At all times relevant to the period here under scrutiny, W. T. Graham (sometimes hereinafter referred to as petitioner or Graham) was the owner of 99.84 percent of the stock of Graham Plow, Inc., a Texas corporation having as its principal place of business Amarillo, Texas. From sometime prior to 1958, and until March 30, 1963, Graham owned a large number of oil and gas leases located in what is known as the Palo Duro Basin petroleum field in the state of Texas. By March 30, 1963 Graham had become indebted to Graham Plow, Inc. in the amount of $525,026.94. On or about this date he offered to satisfy and discharge this obligation by transferring to the corporation certain oil and gas leases owned by him and located *112 in the Palo Duro Basin valued at $422,415.90 together with his promissory note in the amount of the balance, or $102,611.04. This offer was accepted by the corporation's board of directors at its annual meeting on March 30, 1963, [4] and on or about that date petitioner transferred the leases, together with his promissory note, to the corporation. As of the end of the corporation's fiscal year March 31, 1963, it had accumulated earnings and profits in the amount of $296,159.52. *113 Upon audit of petitioner's joint Federal income tax return for the taxable year 1963, respondent scrutinized the above transaction and determined that the fair market value of the leases transferred to the corporation by petitioner did not exceed $244,228.46 at the time of the transfer, with the result that the difference between the amount cancelled as indebtedness by the corporation ($422,415.90), and the amount redetermined by respondent to represent the fair market value of the leases transferred ($244,228.46), or $178,187.64, represented a constructive dividend distributed to petitioner. The Palo Duro Basin, in which the leases here in question were located, is a loosely defined "wildcat" petroleum field spanning some thirty-two counties near the southern end of the Texas panhandle. During the years that are relevant to this proceeding, the Palo Duro Basin was regarded as a "wildcat" petroleum area because, even though substantial hydrocarbon deposits were believed to exist in the area, no substantial oil strikes had been made there, and none of the "major" oil companies had undertaken actual development within the field. Nevertheless, several factors combined to engender *114 a continuing speculative interest in the Palo Duro Basin among oil men. It was bounded on the north by the very productive Anadarko Basin and on the south by the Midland and the legendary Permian Basins. Moreover, seismic testing for hydrocarbon deposits within the area reflected a significant number of structural highs in the sedimentary layer above the basement rock, whose permeability and porosity were deemed sufficient to permit commercial extraction of hydrocarbons. Such scientific data, taken together with the fact that many major finds of hydrocarbon deposits are made in areas once considered barren of commercial deposits, served to discount previous failures to make strikes in the Palo Duro Basin. For a period of time between 1958 and 1961 the Texas Company (now known as Texaco, Incorporated), one of the world's largest oil companies, made efforts to develop the Palo Duro Basin. Seismic tests conducted by them had indicated that several good prospects were present, including some on land leased by petitioner. Accordingly, the Texas company leased a number of unencumbered parcels within the Basin, and, prior to March 30, 1963, commenced negotiations with petitioner for *115 the purchase of his leases. These negotiations culminated in an offer to petitioner for the purchase of his entire block of leases $25for an acre plus a one-sixteenth overriding royalty therein. [5] Since it appears that petitioner held at least 100,000 acres under lease at the time this offer was made, the minimum amount represented by the offer was in excess of $2,500,000. Despite the amount involved, petitioner rejected the offer. Nevertheless, the Texas Company continued to purchase leases within the Palo Duro Basin through the end of 1963 even though in 1961 it met with failure in drilling two wells on leases which it owned. *116 Sometime in late 1963, subsequent to the transfer of the leases here in question by petitioner to Graham Plow, Inc., the corporation, acting through petitioner, solicited an offer from Maguire Oil Company of Dallas, Texas for the leases. Maguire was an "independent" oil company operating on a much smaller scale than the Texas Company and the other six world-wide oil companies which together form the "seven sisters" of the international petroleum business. Such small, "independent" oil companies do business from a more highly leveraged, less liquid position than do the "majors". Instead of expending large amounts of cash for bonus payments [6] and annual "delay" rentals [7] to hold land under lease for their exclusive exploration, independent companies prefer to engage in joint undertakings in which they expend their available funds in the actual exploration for petroleum. One of the reasons underlying this preference is founded on accounting and tax principles; bonus payments are deemed advance royalties which must be regained through depletion, [8] while actual drilling costs may be expensed during the current year. Delay rentals may either be expensed during the current taxable *117 year as carrying charges or charged to a depletable capital account at the lessee's election. [9] Moreover, any annual income deficit resulting from fruitless drilling may be carried forward or backward to reduce taxable income in other years. Where initial drilling produces even a moderately good show of oil, commercial loans may be arranged to finance further development of the project. *118 After reviewing land maps and geophysical and subsurface information provided by petitioner and his geophysicist on behalf of Graham Plow, Inc., Maguire Oil determined that the area covered by the leases showed sufficient promise to warrant its investment therein. Accordingly, it offered to drill nine wells within the leased acreage at no cost to Graham Plow, in exchange for an undivided one-half interest in the leases. Maguire regarded this offer as the equivalent of paying Graham Plow, Inc. $1,000,000 in exchange for a one-half interest in the leases. Graham Plow, however, insisted on the actualpayment of $1,000,000 in cash in advance plus the drilling of the nine wells at no cost to it as its price for a one-half interest in the leases, and Maguire, unwilling to make a capital investment of this magnitude, terminated the negotiations. Maguire, however, did continue actively in the Palo Duro Basin during 1963, purchasing a number of leases there, although subsequent to the conclusion of its negotiations with Graham Plow it declined to pick up any of the leases here in issue upon their expiration, inasmuch as it felt an ethical obligation to refrain from using information *119 gained during its negotiations with Graham Plow. Although the record is devoid of evidence with respect to activity concerning the leases in question during the period 1964 to 1966 (or, for that matter whether in the then prevailing commercial market for oil, extraction in the Palo Duro Basin would have even been economically feasible), further interest in these leases did manifest itself in 1967. During that year Newman Brothers Drilling Company, an "independent" company became interested in the Palo Duro Basin based upon its knowledge of the productive Permian Basin to the south, and on reports from other explorers that a significant number of structural "highs"-- connoting the presence of hydrocarbons--were present in the Palo Duro Basin. Completely convinced that commercial deposits of oil were present within the Basin, Newman Brothers approached Graham Plow with an offer to develop its entire block of leases. Under the terms of this offer Newman Brothers agreed to drill six wells on the leased acreage at no cost to Graham Plow, to pay Graham Plow a one-fourth overriding royalty from the time production began until the time all of Newman's production costs relating to drilling *120 and completing the wells were recovered, and thereafter to pay Graham Plow one-half of its seveneights working interest. Newman Brothers deemed the value of this offer to be at least $450,000 and quite possibly as high as $900,000. As before, both petitioner and Graham Plow rejected the offer on the grounds that it did not include a cash prepayment prior to development, and Newman unwilling to make a capital investment of the magnitude required by Graham Plow ($1,000,000), terminated its offer. ULTIMATE FINDING OF FACT Respondent erred in determining that the fair market value of oil and gas leases transferred by W. T. Graham on March 30, 1963 to Graham Plow, Inc., was less than the amount of indebtedness cancelled by the corporation in exchange therefor. OPINION Section 301 [10] of the Internal Revenue Code requires that a distribution of property by a corporation to a shareholder be treated as ordinary income to the extent that it constitutes a dividend within the purview of section 316 thereof. Section 316, [11] in turn, defines the term "dividend" to mean any distribution of property, made by a corporation to its shareholders out of its earnings and profits, and *121 "property," of course, includes an indebtedness to the corporation. [12] Finally, section 1.301-1(j) of the Income Tax Regulations provides that where * * * property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * * *122 Inasmuch as on March 31, 1963 Graham Plow, Inc. had earnings and profits of $296,159.52, its cancellation of petitioner's indebtedness in exchange for his oil and gas leases would have resulted in the distribution to him of a dividend, taxable as ordinary income, to the extent that such oil and gas leases had a fair market value of less than the indebtedness cancelled in exchange therefor, and to the extent that such dividend did not exceed the corporation's earnings and profits. Thus, the issue clearly framed, is the fair market value of the leases in question on the date of their transfer. As both parties recognize, the question is one of a subjective nature, answerable only by reference to objective criteria. Petitioner's position has been that the value of the leases was at least $422,415.90 on the date of the transfer, and that this has been demonstrated by a showing of three bona fide offers from different oil companies on both sides of the crucial date for the right to purchase either all of the leases or an undivided one-half interest therein. Respondent has countered by pointing to evidence that the Palo Duro Basin, wherein the leases were situate, was not significantly *123 productive during the period material, that historically the area had been unproductive, that the "major" oil companies had shown only sporadic interest therein, that the Texas Company virtually abandoned the Basin after its negotiations with petitioner reached a stalemate, and that Graham Plow permitted a substantial number of the leases to expire during 1964. Additionally, respondent has questioned the basic motive underlying the interest of both Maguire Oil and Newman Brothers, arguing that since neither offered to purchase the leases out-right, but proposed to acquire its interest therein merely by expending budgeted annual drilling costs, the offers of both Maguire and Newman should be viewed as being prompted by a desire to lower their own Federal income tax liability through the expensing of drilling costs, rather than by any serious desire to engage in development of new sources of oil. Finally, respondent has relied on the testimony of Dr. Frank Conselman, a witness of extensive theoretical knowledge in the oil and gas field, whose testimony centered around his use of a formula which he had derived during the course of some fifteen years in the making of appraisements of *124 oil and gas leases. After review of the entire record, we are of the view that the true fair market value of the leases here in question is more accurately established by the offers of the three oil companies than by any other evidence. In each instance, the offer that was made exceeded the fair market value assigned to the leases upon their transfer to Graham Plow. While it is true that none of the offers was made on the exact date of the transfer, it is recognized that such offers do form an acceptable basis for determining fair market value in the absence of more persuasive evidence. See section 1.611-2(d), Income Tax Regs., and Miles Production Company v. Commissioner,457 F. 2d 1150 (5th Cir., 1972), affirming a Memorandum Opinion of this Court. At the outset, we find that each of the offers made by Texaco, Maguire Oil, and Newman Brothers was a bona fide business offer made by an organization actively searching for commercially exploitable deposits of hydrocarbons. It should be noted here that our concern has not been with the exact number of acres under lease, their original cost, nor their adjusted basis in 1963. Despite the controversy between *125 the parties over these figures, the record as a whole supports a conclusion that at least 100,000 acres were involved, and that a significant portion of this acreage was bargained for in each of the offers. What has concerned us here is the fair market value of the propertyexchanged, and in making a determination thereof we have carefully taken into consideration that there is rarely a meaningful relationship between cost and fair market value where, as here, offers to buy occurred some years after purchase. Estate of Jeremiah Roberts Downing.12 B.T.A. 1180 (1928); Parkersburg & Marietta Sand Co.,11 B.T.A. 87 (1928); Rufus L. Patterson,10 B.T.A. 469 (1928), aff'd 42 F.2d 148 (2d Cir. 1930); Sherman Stalter Co.,4 B.T.A. 23 (1926). Witnesses testifying for both parties have agreed that many factors influence the value of oil and gas leases within any oil basin at any given point in time. Among these are the degree of historical and current exploration within the area, the presence or absence of activity there of the major oil companies, the negotiating ability of landowners and *126 leaseholders, the proximity of producing basins, and the relationship current at the time of negotiation between the price of petroleum products and the cost of extraction predicted for the area. Exploration for oil and gas deposits unquestionably is a very risky business. This is particularly true in a wildcat area such as the one encompassed by the Palo Duro Basin. The costs associated with searching for hydrocarbons are high. Although commercial deposits are discovered in only a small fraction of wells drilled, the economic return from a successful well is high enough to encourage the petroleum industry to continue risking investment in the hope that new strikes will be made. As proven fields become crowded or run dry, oil companies extend their search to more marginal areas, such as the Palo Duro Basin. Enough major finds have been discovered in disregarded or abandoned areas to encourage more testing and drilling in similar areas by different companies. Thus, we are unwilling to discount the value of the leases in issue simply because several companies abandoned the area, nor do we find it peculiar that Maguire Oil and Newman Brothers would invest in an area abandoned by *127 the Texas Company, or for that matter, by Humble Oil. As has been indicated, there are in general two distinct classes of companies regularly engaged in the search for oil and gas. The industry is dominated by several very large international entities, each of which enjoys a highly liquid cash position, uses the most advanced equipment, and generally assumes a conservative stance regarding new investments. The Texas Company is an example of such an entity. Maguire Oil Company and Newman Brothers belong to another class of entities known generally as independents. These companies characteristically assume greater business risks by searching for hydrocarbons in less developed, wildcat areas, and operate from a less liquid cash position. Given the nature of these two classes of explorers for oil and gas, we believe that the fact that the Texas Company offered cash in exchange for the leases here in question, while Maguire and Newman Brothers sought to acquire an interest therein by drilling wells, is perfectly explicable. The Texas Company obviously had the cash to offer, and this was its method of operation. The contention that both Maguire Oil and Newman Brothers negotiated *128 with Graham Plow solely for the opportunity to accumulate current income deductions by exhausting their respective budgeted drilling expense is not well founded. The facts show that both Maguire Oil and Newman Brothers had every expectation of striking oil or gas deposits within the Palo Duro Basin, or of at least discovering "good shows" once drilling commenced. While it may be that tax considerations entered into the formulation of each of their respective offers (e.g., that a loss arising from unsuccessful drilling might be written off) such considerations cannot be held to have been dominant in light of the fiercely competitive nature of the oil industry. After all, the primary purpose of both Maguire Oil and Newman Brothers was the location and extraction of petroleum, not the manufacture and production of tax deductions. Nor do we accept the view that the offers of Maguire Oil and Newman Brothers are to be discounted to reflect an intrinsic value lower than the total expenses to be incurred merely because no passage of ownership was to precede a discovery of petroleum under these offers. Certainly, in the event a strike was made under either offer, partial ownership *129 of the entire block of leases would have passed in exactly the same fashion passage of title would have taken place subsequent to a cash offer predicated upon a similar condition. In the case of each offer, cash was intended to be expended on behalf of Graham Plow in an attempt to earn a one-half interest in its leases. Clearly, a benefit was to pass thereby to Graham Plow. It is true, as has been pointed out by respondent, that Graham Plow permitted some portion of the leases here in question to lapse after 1963--action it is contended supports the view that such leases--indeed the entire block of leases--lacked value. Yet Graham Plow continued between 1964 and 1967 to purchase new leases in the Palo Duro Basin simultaneous with the lapsing of the old ones. All companies must surely operate within some budgetary constraints, and it is not at all uncommon for an oil company to drop leases considered somewhat desirable in order to free funds for the acquisition of more favorable leases. Nor does the record's reflection of only three offers for the leases in question between 1963 and 1967 diminish their value in our view. The Palo Duro Basin was not an active Basin at *130 this time and a regular series of offers for leases in a wildcat area is not to be expected. Moreover, the resolute demand of both petitioner and Graham Plow for substantial cash in advance may have served as a deterrent to such offers. The price for oil and gas leases, as has been indicated, is determined by many factors. Some derive from scientific data, some are predicated upon cold facts, while others hinge on intangible elements and human emotion. The formula postulated by Dr. Frank Conselman, on behalf of respondent, for determining the fair market of the leases here in question was relied heavily upon by respondent. Although the formula incorporates a number of known quantities, a most crucial element therein (i.e., the "D" factor) is brought to bear on a subjective basis predicated upon the experience of Dr. Conselman. While such experience is extensive, and Dr. Conselman's reputation well established, we are unwilling to give conclusive weight to the experience of one man in determining this issue. Fair market value is, of course, a question of fact, the burden of proving which has rested in this proceeding with petitioner. And after a review of all the facts herein *131 we are inclined toward the belief that petitioner has carried the burden of establishing that the leases here in question had a fair market value of at least $422,415.90 on the date on which he transferred them to Graham Plow. Accordingly, we find that respondent erred in determining that petitioner received a taxable dividend in 1963 as the result of his transfer to Graham Plow, Inc. of these oil and gas leases in exchange for the cancellation by that corporation of indebtedness owing by petitioner. II. FINDINGS OF FACT During each of the taxable years 1961 and 1962 [13] Graham Plow, Inc. paid its vice-president, Kate Graham, a salary of $10,000 per year. On its corporate Federal income tax return for these years, Kate Graham was listed as vice-president, part-time, while C. E. Lyle was listed as vice-president, full-time. Lyle received in these years the respective amounts of $5,200 and $5,100 for his services as full-time vice-president. During neither 1961 nor 1962 did Kate Graham perform a regular set of tasks for Graham Plow, nor did she occupy an equipped office as do persons of equivalent stature in other enterprises. In general, *132 and from time to time, she did answer telephones, make arrangements for business trips and conferences, discuss financial matters with W. T. Graham, Graham Plow's president, participate in the corporation's public relations efforts, direct the upkeep of the company's premises, and generally serve as confidante and assistant to W. T. Graham. The record does not reflect, however, precisely how many of these duties were performed by her in each of the years 1961 and 1962, the quantum of time required to be spent performing them within that period, or the corresponding data for either the corporation's full-time vice-president or its full-time secretary-treasurer. Upon audit of the Federal corporate income tax return of Graham Plow, Inc. for its taxable year ended March 31, 1961 respondent determined that the salary paid Kate Graham in that year in excess of $3,600 was unreasonable in light of the services performed by her in exchange therefor and, accordingly, nondeductible as an ordinary and necessary business expense within the purview of section 162(a)(1) of the Code. He also determined that a net operating loss available to Graham Plow as a carryback from 1962 should be reduced *133 by the amount paid Kate Graham in that year in excess of $3,600. See section 6214(b) of the Code and Lone Manor Farms, Inc.,61 T.C. 436 (1974). OPINION The question of the reasonableness of salary paid by a corporation to its officers is one of fact, and as with all such questions, the burden of proof thereon lies with petitioner. Botany Worsted Mills v. United States,278 U.S. 282 (1929). Graham Plow is a closely held corporation whose direction is dictated largely by W. T. Graham. While we are normally reluctant to place ourselves in the position of a corporate board of directors in salary matters, we are ever mindful that a rule of close scrutiny obtains wherever transactions between stockholder officers and their families, and their corporations, are questioned. Ox Fibre Brush Co. v. Blair,32 F.2d 42 (4th Cir., 1929), aff'd sub. nom. Lucas v. Ox Fibre Brush Co.,281 U.S. 115 (1930). Although it is evident from the record that Kate Graham contributed in many ways to the growth and development of Graham Plow over several decades, it is silent as to the relative number of duties and the difficulty thereof, *134 vis-a-vis the corporation's full-time vice-president and secretary-treasurer, which Kate Graham performed during the years in question. Since the full-time vice-president received a little over half the salary paid Kate Graham during 1961 and 1962, and since we are unaware of what duties he performed, we are left with no yardstick by which to value the services performed by Kate Graham as part-time vice-president. Accordingly, we are unwilling to disturb the determination made by respondent that Kate Graham was, in each of the years 1961 and 1962, overcompensated in the amount of $6,400. * * *
In accordance with the foregoing, Decision will be entered for petitioners in Docket No. 6460-67. and Decision will be entered for respondent in Docket No. 6461-67. Footnotes
1. These cases were consolidated for purposes of trial, briefing, and opinion upon joint motion of the parties.↩
2. All Code references herein are to the Internal Revenue Code of 1954, as amended. ↩
3. Although the 1962 fiscal year of Graham Plow, Inc. is not before the Court, the reasonableness of salary paid by it to Kate Graham in that year is an issue herein by reason of an adjustment made by respondent to a net operating loss utilized by the corporation as a carryback from 1962 to 1961. This adjustment reduced the amount of the 1962 corporate loss available as a carryback to 1961 by the amount determined to have been unreasonably paid Kate Graham as salary in 1962, i.e., the amount in excess of $3,600. The parties agree this issue is properly before the Court. See also Lone Manor Farms, Inc.,61 T.C. 436↩ (1974), and sec. 6214(b) of the Code.
4. In pertinent part, the resolution of the board of directors of Graham Plow, Inc. adopting acceptance of petitioner's offer states as follows: 5. Whereas, W. T. Graham, in full payment and discharge of his indebtedness to the corporation in the amount of $525,026.94 has offered to: (a) Transfer and assign to the corporation all of the oil and gas leases set forth and described in the Schedule of Assignments dated this date and attached hereto and covering approximately 118,061.68 acres of land, more or less, located in Randall, Swisher, Briscoe, Floyd, Hale, Motley, Armstrong, Carson and Cottle Counties, Texas, these oil and gas leases to be valued at $422,415.90 and applied in reduction in that amount to his hereinabove specified indebtedness; and (b) To execute his promissory note in the amount of $102,611.04 to the corporation bearing interest at the rate of 5% per annum and payable in two annual installments of $35,000.00 each and a third installment of $32,611.04; said note to be secured by an assignment by the said W. T. Graham of patent royalties due and payable to him, by the corporation, annually as hereinabove authorized and approved. On motion duly made, seconded, and carried, it was: RESOLVED that the above proposition of W. T. Graham be accepted by the corporation and upon compliance therewith by him that his indebtedness of $525,026.94 to the corporation be fully discharged, satisfied and that the acts and deeds of the officers of the corporation be and they are hereby ratified and confirmed in all respects in connection with this transaction, and said oil and gas lease assignments, at this time for business reasons, be not placed of record, but remain in the custody of W. T. Graham as agent of the Corporation as per list included in the minutes of the Corporation.↩
5. Landowners granting others the right to explore for hydrocarbons on their property typically retain an interest known as a "royalty interest" in any reserves discovered and exploited. This interest is expressed in terms of a percentage of gross production or gross profits from sales. See J. T. Sneed, Jr.,33 B.T.A. 478 (1935). A one-eighth royalty is common, but the percentage is subject to negotiation. A royalty is a nonoperating mineral interest unburdened with any exploration, development, or production costs. See sec. 1.614-2(b) and sec. 1.614-5(g), Income Tax Regs.
An "overriding royalty interest" is retained by a leaseholder from the normal seven-eighths working interest when all or any portion of the lease is assigned or subleased to a third party. As with royalty interest, overriding royalties are determined through negotiations and expressed in terms of a percentage of gross production.↩
6. A bonus payment is made by a lessee in exchange for the lessor's execution of an oil and gas lease. Carroll v. Bowen,180 Okla. 215, 217, 68 P. 2d 773, 775↩ (1937). Calculated on a per-acre basis, bonus payments are payable in cash, product, or in the form of an additional royalty to the lessor. The payment of a bonus normally gives the lessee the right to explore for one year following the execution of the lease. 7. A delayrental is a sum, calculated on a per-acre basis, payable annually by a lessee to a lessor for the privilege of deferring commencement of drilling or production for one year during the primary term of an existing lease. See Opine Timber Co.,64 T.C. 700 (1975); J. T. Sneed, Jr.,33 B.T.A. 478 (1935); Commissioner v. Wilson,76 F. 2d 766 (1935); sec. 1.612-3(c)(1), Income Tax Regs.↩
8. Burnet v. Harmel,287 U.S. 103 (1932); Seth Campbell,41 T.C. 91↩ (1963). 9. See Sec. 1.612-3(c)(2), Income Tax Regs.↩
10. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317 (a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * *
(c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount Constituting Dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. ↩
11. SEC. 316. DIVIDEND DEFINED. (a) General Rule.--For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders-- (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩
12. See section 1.317-1, Income Tax Regs.↩
13. See n. 3, supra.↩