T.C. Memo. 1999-170


UNITED STATES TAX COURT


BERNICE M. AND STANLEY M. ULANOFF, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  15253-87, 24339-95.          Filed May 19, 1999.


Stanley M. Ulanoff, pro se.

<u>Louise R. Forbes</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


DAWSON, <u>Judge</u>:  These consolidated cases were assigned to
Special Trial Judge Robert N. Armen, Jr., pursuant to the
provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[1]

_____

    [1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge: Respondent determined a deficiency, additions to tax, and additional interest with respect to petitioners' Federal income taxes for the years and in the amounts as shown below:

Docket No. 15253-87

| Year | Deficiency | Additions to Tax | | Sec. 6659 | Additional Interest Sec. 6621(c) |
|---|---|---|---|---|---|
| | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | | |
| 1981 | $7,747 | $387 | [1] | $2,277 | [2] |

Docket No. 24339-95

| Year | Deficiency | Additions to Tax | | Sec. 6659 | Additional Interest Sec. 6621(c) |
|---|---|---|---|---|---|
| | | Sec. 6653(a)(1) | Sec. 6653(a)(2) | | |
| 1982 | -- | 1,147 | [1] | 3,542 | -- |
| 1983 | -- | 321 | [1] | 1,842 | -- |
| 1984 | -- | 396 | [1] | 2,229 | -- |

[1] 50 percent of the portion of the underpayment that is attributable to negligence. For 1982 through 1984, the underpayments ($22,947 for 1982, $6,141 for 1983, and $7,431 for 1984) were determined and assessed pursuant to a partnership-level proceeding. See secs. 6231-6233. In the present cases, respondent determined that the entire underpayment for each of the years in issue is attributable to negligence.

[2] Interest on the entire underpayment to be computed at 120 percent of the rate otherwise applicable under sec. 6621(a).

After a stipulation by the parties,[2] the issues remaining for decision are as follows:

(1) Whether petitioner Stanley M. Ulanoff (petitioner) is entitled to (1) a partnership loss and (2) investment and energy credits for 1981 flowing from the Sentinel EPE recycler leasing program entered into by Plymouth Equipment Associates. We hold that he is not.

(2) Whether petitioner is liable for additional interest under section 6621(c) with respect to the underpayment for 1981. We hold that he is.

(3) Whether petitioner is liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations for each of the years in issue. We hold that he is.

(4) Whether petitioner is liable for the addition to tax under section 6659 for an underpayment of tax attributable to a valuation overstatement for each of the years in issue. We hold that he is.

---

[2] The parties stipulated that pursuant to the provisions of sec. 6015(b), petitioner Bernice M. Ulanoff is not liable for the deficiency, additions to tax, and additional interest as determined by respondent in the notices of deficiency at issue herein.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Roslyn Estates, New York, at the time that their petitions were filed with the Court.

A. The Recycling Transactions

These consolidated cases are part of the Plastics Recycling group of cases. In particular, the deficiency, additions to tax, and additional interest for 1981 and the additions to tax for 1982 through 1984 arise from the disallowance of losses, investment credits, and energy credits claimed by petitioner with respect to the following two partnerships: (1) For 1981, Plymouth Equipment Associates (Plymouth); and (2) for 1982 through 1984, Taylor Recycling Associates (Taylor). For convenience, we refer to Plymouth and Taylor collectively as the Partnerships.

For a detailed discussion of the transactions involved in the Plastics Recycling group of cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying transactions involving the Sentinel recycling machines (recyclers) in petitioner's cases are substantially identical to the transactions in Provizer v. Commissioner, supra, and, with the exception of certain facts that we regard as having minimal significance, petitioner has stipulated substantially the same

facts concerning the underlying transactions that were described in Provizer v. Commissioner, supra.

The transactions involving the Sentinel EPE recyclers leased by Plymouth are substantially identical to the transactions involving the same type of recyclers leased by Clearwater Group (Clearwater), the partnership that was involved in Provizer v. Commissioner, supra.[3]

In transactions closely resembling those in the Provizer case, Packaging Industries of Hyannis, Massachusetts (PI) manufactured and sold seven Sentinel EPE recyclers to ECI Corporation (ECI) for $981,000 each. PI manufactures thermoplastic and other types of packaging machinery, as well as energy saving devices. ECI, in turn, resold the recyclers to F&G Corporation (F&G) for $1,162,667 each. F&G then leased the recyclers to Plymouth, which licensed the recyclers to FMEC Corporation (FMEC), which sublicensed them back to PI.

The sales of the recyclers from PI to ECI were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI to F&G was paid in cash, with the remainder financed through notes. These notes provided that 10 percent of the notes were recourse but that the recourse portion

---

[3] Terms such as lease, sale, license, and their derivatives are used solely for convenience, and their use in this Opinion should not be understood to imply that the transactions described herein constitute leases, sales, or licenses for Federal tax purposes.

of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.  No arm's-length negotiations for the price of the Sentinel EPE recyclers took place among PI, ECI, and F&G.  All of the monthly payments required among the entities in the above transactions offset each other.  These transactions occurred simultaneously.

PI allegedly sublicensed the recyclers to entities that would use the recyclers to recycle plastic scrap.  These agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC based on the quality and amount of recycled scrap.

Both Clearwater and Plymouth leased Sentinel EPE recyclers from F&G and licensed those recyclers to FMEC.  For convenience, we refer to the series of transactions among PI, ECI, F&G, Plymouth, and FMEC, as the Plymouth transactions.

In addition to the Plymouth transactions, a number of other limited partnerships entered into transactions similar to the Plymouth transactions, some of which involved Sentinel EPE recyclers and others of which involved Sentinel EPS recyclers. One such partnership was Taylor, which leased four Sentinel EPS recyclers.  We refer to the transactions involving Taylor and the EPS recyclers as the Taylor transactions.

The Taylor transactions were substantially similar to the Plymouth transactions described above and the Clearwater transactions described in Provizer v. Commissioner, supra.

Taylor was a first-tier TEFRA partnership. In 1988, a partnership proceeding captioned Taylor Recycling Associates, DL&K Associates, A Partner Other Than the Tax Matters Partner v. Commissioner, docket No. 10184-88 (the Taylor case) was commenced in this Court in respect of the Taylor transactions. Petitioner filed a Notice of Election to Participate in the Taylor case in February 1994. Subsequently, on July 21, 1994, the Court entered decision in the Taylor case pursuant to the Commissioner's Motion for Entry of Decision under Rule 248(b). All deductions and credits claimed by Taylor in connection with its plastics recycling activities were disallowed. Paragraph 2 of the motion stated in pertinent part that "Stanley M. Ulanoff agree[s] to the proposed decision in the [Taylor] case".

B. Individuals Involved

Richard Roberts (Roberts) was the general partner of both Plymouth and Taylor and owned a 1-percent interest in each partnership. Roberts was also the general partner in a number of other limited partnerships that leased and licensed Sentinel recyclers. He also was a 9-percent shareholder in F&G, the corporation that leased the recyclers to Plymouth. From 1982 through 1985, Roberts and Raymond Grant (Grant) were in the business of promoting tax sheltered investments. Grant was the president and 100-percent owner of ECI. Roberts and Grant together were general partners in other partnerships. Prior to

the Plymouth transactions, Roberts and Grant were clients of the accounting firm H.W. Freedman & Co. (Freedman & Co.).

Harris W. Freedman (Freedman), a certified public accountant and the named partner in Freedman & Co., was the president and chairman of the board of F&G. Freedman was experienced with leveraged leasing, and he owned 94 percent of a Sentinel EPE recycler.

Freedman & Co. prepared the tax returns for ECI, F&G, and the Partnerships, as well as for Clearwater Group. It also provided tax services to John D. Bambara (Bambara). Bambara was the 100-percent owner of FMEC, as well as its president, treasurer, clerk, and director. Bambara was also the president of PI and a member of its board of directors. He, his wife, and his daughter also owned directly or indirectly 100 percent of the stock of PI.

Anthony Giovannone (Giovannone) was the executive vice president of PI and a member of its board of directors.

Elliot I. Miller (Miller) was the corporate counsel to PI. In 1981, Miller was also a shareholder of F&G.

John Y. Taggert (Taggert) was a well-known tax attorney and an adjunct professor at the New York University Law School. Taggert was acquainted with Miller for about 15 years prior to 1981. Miller recommended that Roberts employ Taggert and his firm as counsel. Taggert and other members of his firm prepared private offering memoranda, tax opinions, and other legal

documents for the Partnerships.  Taggert owned a 6.66-percent interest in a second-tier Plastics Recycling partnership.

Robert Gottsegen (Gottsegen) was a businessman active in the plastics industry and a long-time business associate of Bambara.

C.    The Private Offering Memoranda

Plymouth and Taylor each distributed to potential limited partners a private placement memorandum.  Each offering memorandum listed significant business and tax risk factors associated with an investment in the particular partnership. Specifically, each offering memorandum stated: (1) There was a substantial likelihood of audit by the Internal Revenue Service (IRS), and the purchase price paid by F&G to ECI probably would be challenged as being in excess of fair market value; (2) the partnership had no prior operating history; (3) the general partner had no prior experience in marketing recycling or similar equipment; (4) the limited partners would have no control over the conduct of the partnership's business; (5) there was no established market for the Sentinel recyclers; (6) there were no assurances that market prices for virgin resin would remain at their current costs per pound or that the recycled pellets would be as marketable as virgin pellets; and (7) certain potential conflicts of interest existed.

The private offering memorandum for Plymouth stated that the projected tax benefits for the initial year of investment for an investor contributing $50,000 would be investment credits and

energy credits in the aggregate amount of $82,639, plus deductions in the amount of $40,376. The private offering memorandum for Taylor stated that the projected tax benefits for the initial year of investment for an investor contributing $50,000 would be investment credits and energy credits in the aggregate amount of $81,529, plus deductions in the amount of $39,988.

The offering memoranda represented that the Sentinel recyclers were unique machines. However, they were not. Several machines capable of densifying low density materials were already on the market in 1981 and 1982. Other plastics recycling machines available at that time ranged in price from $20,000 to $200,000, including the Foremost "Densilator", the Nelmor/Weiss Densification System (Regenolux), the Buss-Condux Plastcompactor, and the Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177, and the discussion regarding expert testimony, infra.

D.  Expert Testimony

The parties did not agree on the value of either the Sentinel EPE or EPS recyclers, and petitioner did not stipulate to be bound by the value of the Sentinel EPE recyclers that we found in Provizer v. Commissioner, supra, or the value of the EPS recyclers that we found in Gottsegen v. Commissioner, T.C. Memo. 1997-314.

At trial, petitioner did not offer expert testimony regarding the value of either the Sentinel EPE or EPS recyclers. In contrast, respondent offered expert testimony from Steven Grossman (Grossman) and Richard S. Lindstrom (Lindstrom).

1.  <u>Grossman</u>

Grossman is a professor in the Plastics Engineering Department at the University of Massachusetts at Lowell.  He has a bachelor of science degree in chemistry from the University of Connecticut and a doctorate degree in polymer science and engineering from the University of Massachusetts.  He also has more than 15 years of experience in the plastics industry, including more than 4 years of experience as a research and development scientist at the Upjohn Company in its Polymer Research Group.
Grossman is also a partner in the law firm of Hayes, Soloway, Hennessey, Grossman & Hage, P.C., which firm practices in the area of intellectual property, including patents, trademarks, copyrights, and trade secret protection.

Grossman's reports concerning the value of the Sentinel EPE and EPS recyclers were very similar, and we discuss them together.  These reports discuss the limited market for the recycled plastic material.  Grossman concluded that the Sentinel EPE and EPS recyclers were unlikely to be successful products because of the absence of any new technology, the absence of a continuous source of suitable scrap, and the absence of any

established market.  Grossman suggested that a reasonable comparison of the products available in the polyethylene industry in 1981 and the polystyrene industry in 1982 with the Sentinel EPE and EPS recyclers, respectively, reveals that the Sentinel recyclers had very little commercial value and were similar to comparable products available on the market in component form. For these reasons, Grossman opined that the Sentinel EPE and EPS recyclers did not justify the "one-of-a-kind" pricetag that they carried.

Specifically, Grossman reported that there were several machines on the market as early as 1981 that were functionally equivalent to, and significantly less expensive than, both the Sentinel EPE and EPS recyclers.  These machines included: (1) The Japan Repro recycler, available in 1981 for $53,000; (2) the Buss-Condux Plastcompactor, available before 1981 for $75,000; (3) Foremost Machine Builders' "Densilator", available from 1978-1981 for $20,000; and (4) the Midland Ross Extruder, available in 1980 and 1981 for $120,000.  Grossman observed that all of these machines were "widely available".

Grossman's opinion regarding the Sentinel EPS recycler was based on personal examination of such recycler, as well as the descriptions thereof that were set forth in the writings of other professionals.  Although Grossman did not observe the Sentinel EPS recycler in actual operation, he examined both the Sentinel EPS recycler and the Japan Repro recycler and found that the

construction of the two machines was "nearly identical".
Further, Grossman concluded that the recycled polystyrene
produced by both machines would also be nearly identical.  In
Grossman's opinion, neither the Japan Repro recycler nor the
Sentinel EPS recycler represented "a serious effort at recycling"
because the end-product from both machines was not completely
devolatilized and required further processing.  It was also
Grossman's opinion that an individual who seriously wanted to
recycle would not purchase either of these machines.

Grossman's opinion regarding the Sentinel EPE recycler was
based on the descriptions of such recycler as set forth in the
writings of other professionals.  Grossman neither tested nor
examined the Sentinel EPE recycler.

Finally, Grossman reported on the relationship between the
plastics industry and the petrochemical industry.  Grossman noted
that although the development of the petrochemical industry is a
contributing factor in the growth of the plastics industry, the
two industries have a "remarkable degree of independence".
Grossman observed that the "oil crisis" in 1973 triggered "dire"
predictions about the future of plastics that had not been
fulfilled in 1981.  Grossman stated that the cost of a plastic
product depends, in large part, on technology and the price of
alternative materials.  Grossman's studies concluded that a 300-
percent increase in oil prices results in a 30-40 percent
increase in the cost of plastic.

Grossman did not specifically value either the Sentinel EPE Recycler or the Sentinel EPS Recycler. However, as previously stated, Grossman concluded that existing technology was available that provided equivalent capability of recycling polyethylene and polystyrene. Specifically regarding the Sentinel EPS recycler, Grossman also concluded that recycling equipment that achieved the same result as the Sentinel EPS recycler sold for about $50,000 during the relevant period.

2.   Lindstrom

Lindstrom graduated from the Massachusetts Institute of Technology with a bachelor's degree in chemical engineering. From 1956 until 1989, Lindstrom worked for Arthur D. Little, Inc. in the areas of process and product evaluation and improvement and new product development, with special emphasis on plastics, elastomers, and fibers. At the time of trial, Lindstrom continued to pursue these areas as a consultant.

In his report, Lindstrom determined that several different types of equipment capable of recycling expanded polyethylene were available and priced at approximately $50,000 in 1981. Similarly, Lindstrom determined that several different types of equipment capable of recycling expanded polystyrene were available and priced between $25,000 and $100,000 in 1982. Lindstrom found that, based on his research, "there were available in 1981 commercial units that could be purchased for $50,000 or less that were totally equal to the Sentinel EPE

recycler in function, product quality, and capacity." With respect to the Sentinel EPS recycler, Lindstrom stated that "several machines were available that could reprocess expanded polystyrene into higher quality, more useful, higher value product and these machines or processing systems cost $50,000 to $100,000 in 1982."

Lindstrom examined the Japan Repro recycler, the Buss-Condux Plastcompactor, and the Nelmor Regenolux. Lindstrom found that these machines were functionally equivalent to the Sentinel EPS recycler and were available in the years and at the prices reported by Grossman, detailed supra. Lindstrom also reported that various equipment companies, such as the Cumberland Engineering Division of John Brown Plastics Machinery, were willing to provide customized recycling programs to companies at a minimum cost of $50,000.

Lindstrom found that in "average-use situations", the Sentinel EPE recycler could process 200 pounds of plastic per hour and the Sentinel EPS recycler could process between 100 and 200 pounds of plastic per hour.

Lindstrom observed a Sentinel EPE recycler in operation at PI, and he was allowed to take photographs of the recycler and look at its blueprints. Based on his observations and study, Lindstrom estimated that the manufacturing cost of the Sentinel EPE recycler was approximately $20,000. Lindstrom concluded that

the market value of the Sentinel EPE recycler did not exceed $50,000.

Lindstrom observed a Sentinel EPS recycler in operation and was allowed to inspect the machine closely. Lindstrom estimated that the manufacturing cost of the Sentinel EPS recycler was approximately $20,000 and market value of the machine was approximately $25,000.

E.   Petitioner and His Introduction to Plymouth and Taylor

Petitioner acquired a 1.27-percent interest in Plymouth in 1981 for $12,500. Later that year, Plymouth closed its business. Petitioner acquired a 4.37-percent interest in Taylor in 1982 for $37,500.

Petitioner holds a Ph.D. in marketing. During the years in issue, petitioner was employed as a marketing professor, author, and consultant. At the time of his retirement in 1985, petitioner had been a professor of marketing for more than 25 years. Petitioner is also an author and has written more than 30 books. In addition, he has produced approximately 150 documentary films.

Petitioner served in World War II and in the U.S. Army Reserve and has been a consultant to the U.S. Government, the Postal Service, and certain private entities.

Since childhood, petitioner has been concerned with protecting natural resources. Petitioner makes every effort to conserve energy and recycle consumer material.

Before his investment in the Partnerships, petitioner had no education in plastics recycling or plastics material, nor any work experience in that area. From 1948 to 1958, petitioner was a principal in a packaging supply company that had a plastics material and plastics machinery division.

Sometime in 1981, petitioner became an evaluator of the Plastics Recycling transactions. Petitioner prepared a marketing opinion report for both the EPE and the EPS recyclers. Petitioner's report, along with that of Dr. Samuel Z. Burstein (Burstein), a mathematics professor and a partner in another recycling partnership that leased Sentinel EPS recyclers, were appended to the offering memoranda used in conjunction with the plastic recycling transactions.

In his marketing opinion regarding the Sentinel EPE recycler, petitioner opined as follows:

> It is important to note that there are a number of machines on the market for processing rigid and other forms of plastic. However, to the best of my knowledge, the only machine that will process expanded polyethylene (foam), reduce its bulk, increase its density from 1 pound per cubic foot to 22 pounds per cubic foot while maintaining polymer molecular weight and weight distribution with a minimal increase in melt index, purify it, and vent off gases as well as residual steam and transient foreign particulate, is the Sentinel Recycler Recovery System.
>
> From a marketing perspective, I see [partnership name]'s project as a very feasible and timely one, considering the capability of the Recycler to effectively reprocess waste into a viable and marketable raw material at a greatly reduced cost.

In my opinion, the marketing strategy worked out by FMEC, licensee to [partnership name], is ingenious and bound to succeed. [Partnership name]'s license with FMEC requires additional royalty payments over and above the minimum annual royalty, to be computed as a share of profits on the sale (or fair market value if used by sublicensees) of the resin pellets resulting from further processing the recycled material produced by the Recycler.

Petitioner made similar observations in his marketing report regarding the Sentinel EPS recycler, concluding that investment in transactions involving the Sentinel EPS recycler would be profitable. At the time that this report was written, petitioner was aware of difficulties faced by PI in placing the EPE recyclers with end-users and that only a few such recyclers were operational at that time.

Finally, in both marketing opinion reports, petitioner relied heavily on the assumption that the price of oil would rise dramatically in the future and that, as a result, the price of oil resin would also rise.

Petitioner visited the PI plant in Hyannis, Massachusetts, on two occasions and spent several hours meeting with PI's personnel. At the plant, petitioner observed many types of machines and consumer energy-saving products manufactured by PI. Petitioner also visited a plastic manufacturing plant that used a Sentinel recycler to see it in operation. He observed a Sentinel recycler compress a truck load of plastic scrap into a 4-foot square cube. He conducted limited research regarding plastics recycling by visiting the local library for an hour. Petitioner

also read some periodicals discussing the perceived oil shortage. Finally, petitioner discussed the profitability of the recycling transactions with promoters such as Bambara, Taggert, and Giovannone. These individuals assured petitioner that the Sentinel recyclers were unique. Petitioner did not consult an independent consultant or appraiser with respect to the value of the Sentinel recyclers.

Petitioner never made any profit from his investments in the Partnerships during any year. The projected tax benefits for the initial year of investment described in the Partnerships' offering memoranda greatly exceeded petitioner's investments in the Partnerships. In fact, the tax benefits actually claimed by petitioner on his tax returns for the initial year of investment in the Partnerships greatly exceeded his investments in the Partnerships.

Petitioner's Federal income tax returns for the years in issue were prepared by accountant who had prepared petitioner's returns for many years.

In November 1983, respondent mailed petitioner a so-called "no-change letter" regarding the taxable year 1982. The letter stated as follows:

> We are pleased to tell you that our examination of your tax returns for the above periods shows no change is required in the tax reported. Your returns are accepted as filed.

F.    Ultimate Finding of Fact

At all relevant times, the fair market value of the Sentinel EPE recyclers and the Sentinel EPS recyclers did not exceed $50,000 per machine.

OPINION

We have decided many Plastics Recycling cases.  The majority of these cases, like the consolidated cases herein, presented issues regarding additions to tax for negligence and valuation overstatement.  See Greene v. Commissioner, T.C. Memo. 1997-296; Kaliban v. Commissioner, T.C. Memo. 1997-271; Sann v. Commissioner, T.C. Memo. 1997-259 n.13 (and cases cited therein).  We found the taxpayers liable for the addition to tax for valuation overstatement in all of those cases and liable for the additions to tax for negligence in all but two of those cases.  In a limited number of cases, the taxpayers also contested the underlying deficiency arising from the disallowance of the losses and various credits with respect to their plastics recycling investment.  We sustained the Commissioner on the issue of the underlying deficiency in every one of those cases.

In Provizer v. Commissioner, T.C. Memo. 1992-177, (6th Cir. 1993), a test case for the Plastics Recycling group of cases, this Court: (1) Found that each Sentinel EPE recycler had a fair market value not in excess of $50,000; (2) held that the transaction, which was almost identical to the transactions in the present cases, was a sham because it lacked economic

substance and a business purpose; (3) sustained the additions to tax for negligence under section 6653(a)(1) and (2); (4) sustained the addition to tax for valuation overstatement under section 6659 because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers; and (5) held that losses and credits claimed with respect to Clearwater Group were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

In Gottsegen v. Commissioner, T.C. Memo. 1997-314, this Court found that each Sentinel EPS recycler had a fair market value not in excess of $50,000.

Issue (1)  The Underlying Deficiency for 1981

Petitioner contends that he is not liable for the underlying deficiency for 1981 with respect to his investment in Plymouth. As already mentioned, petitioner has stipulated substantially the same facts concerning the underlying transactions as we found in Provizer v. Commissioner, supra.

The record in the present case regarding the Plymouth transaction plainly supports respondent's determination regarding the underlying deficiency. Petitioner has provided no further evidence nor any novel contention with respect to the underlying

deficiency not previously considered in <u>Provizer</u>.[4]  There is a complete failure by petitioner to prove that the Plymouth transaction was in any meaningful manner different from the circular transaction found to be an economic sham in <u>Provizer</u>. We will not revisit our decision in <u>Provizer</u> and reconsider whether the Plastics Recycling leasing program in which Plymouth participated was an economic sham.  As in <u>Provizer</u>, we rely heavily on the fact that the Sentinel EPE machines were highly overvalued.  We therefore sustain respondent's determination regarding the underlying deficiency for 1981.

<u>Issue (2)  Section 6621(c) Additional Interest for 1981</u>

Respondent determined that petitioner is liable for additional interest for 1981 with respect to the underpayment attributable to petitioner's investment in Plymouth.

Section 6621(c), formerly section 6621(d), provides for an increased rate of interest if the underpayment of tax exceeds $1,000 and is attributable to a tax-motivated transaction as defined in section 6621(c)(3).  The increased rate of interest is effective only with respect to interest accruing after December 31, 1984, notwithstanding that the transaction was entered into before that date.  See <u>Solowiejczyk v. Commissioner</u>, 85 T.C. 552

---

[4]  As previously mentioned, for a detailed discussion of the facts and the applicable law in a substantially identical case, see <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, affd. per curiam without published opinion 996 F.2d 1216 (6th Cir. 1993).

(1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986); Provizer v. Commissioner, supra.

As we held in Provizer, a tax-motivated transaction includes any sham or fraudulent transaction. See sec. 6621(c)(3)(A)(v). We have held that the Plastics Recycling leasing program to which petitioner's 1981 underpayment is attributable was a sham transaction. The tax-motivated increased rate of interest is therefore clearly applicable. Accordingly, we sustain respondent on this issue.[5]

## Issue (3)  Section 6653(a)(1) and (2) Negligence

Respondent determined that petitioner is liable for additions to tax under section 6653(a)(1) and (2) with respect to the underpayment attributable to petitioner's investments in Plymouth for 1981 and in Taylor for 1982 through 1984. Petitioner contends that he was not negligent because: (1) Based on his independent investigation he reasonably expected to make a profit from his investment in the transactions; (2) he reasonably relied upon advice from certain individuals; and (3) he acted reasonably in light of his passion for recycling and his concern for the environment.

---

[5] We note that a tax-motivated transaction also includes any valuation overstatement within the meaning of sec. 6659(c). See sec. 6621(c)(3)(A)(i). It is apparent that there were such valuation overstatements in the present cases. See the discussion under Issue (4), infra, regarding sec. 6659. Accordingly, respondent's determination could also be sustained on this alternative basis.

Section 6653(a)(1) and (2) imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of rules or regulations. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances. See Neely v. Commissioner, 85 T.C. 934, 947 (1985). The pertinent question is whether a particular taxpayer's actions are reasonable in light of the taxpayer's experience, the nature of the investment, and the taxpayer's actions in connection with the transactions. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). In this regard, the determination of negligence is highly factual. "When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers as well as the manner in which the taxpayers approached their investment." Turner v. Commissioner, T.C. Memo. 1995-363. Petitioner has the burden of proving error in respondent's determination of the additions to tax for negligence. See Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

A.  Independent Investigation

Petitioner's first contention is that he was not negligent because he made a thorough independent investigation before he invested in Plymouth and Taylor. Petitioner asserts that his knowledge of certain marketing principles led him to conclude

that the prices of the Sentinel recyclers were reasonable. Petitioner refers to the marketing axiom that a product may be priced at any amount that the market will bear. Petitioner points out that the market will sometimes bear a very high price for a unique product because the product satisfies a void in the marketplace.

Although we do not disagree with these general maxims of marketing, petitioner has not pointed to any specific facts that would support the conclusion that the Sentinel EPE and EPS machines were reasonably priced. In fact, if petitioner had conducted an independent investigation, his awareness of these marketing principles should have led him to conclude that the Sentinel recyclers were not reasonably priced.

The Sentinel EPE and EPS recyclers were not offered to the general public and the traditional principles of supply and demand pricing were therefore inapplicable. See Provizer v. Commissioner, supra. The transactions were structured in a manner such that, with the exception of a minimal down payment for the machines, the majority of the purchase price was in the form of a series of offsetting payments only realized through bookkeeping entries. The purported price tags had nothing to do with traditional principles of supply and demand pricing because the Sentinel recyclers never were offered on the open market, and there is no evidence that anyone ever intended that the recyclers products would be so offered. See Gottsegen v. Commissioner,

supra; <u>Provizer v. Commissioner</u>, <u>supra</u>.  The exorbitant cost of the machines, $1,162,667 for the Sentinel EPE recycler and $1,750,000 for the Sentinel EPS recycler, would therefore have only been reasonable if there were other factors to justify such cost.

However, other factors indicate that the Sentinel recyclers were highly overvalued.  For instance, the Sentinel recyclers were not unique.  Respondent's experts identified other machines that were not only functionally equivalent to the Sentinel recyclers but were also significantly less expensive.  We have found that information regarding comparable, less expensive recyclers was widely available.  If a potential purchaser, especially an individual sophisticated in marketing and research techniques, had conducted a due diligence investigation into the Sentinel recyclers, such potential purchaser should have learned that comparable, less expensive equipment existed and that the Sentinel recyclers were overvalued.

Petitioner claims that in determining the value of the recyclers he did not discover any machines capable of performing the functions performed by the Sentinel recyclers.  However, there is no indication in the record that petitioner surveyed the then current information regarding recyclers.[6]  Rather,

---

[6]  In his marketing reports, petitioner stated that he independently investigated the value of the recyclers by discussing the matter with "nonrelated principals in the
(continued...)

petitioner's independent research in this regard was limited to a very short visit to a local library and a review of certain articles regarding the so-called oil crisis.  As already mentioned, a marketing professor should have realized that in order to identify comparable recyclers and to determine the value of the Sentinel recyclers, he would need to investigate the matter further.  It appears that petitioner relied much more on the representations made by the promoters, such as Taggert and Bambara, than he did on any independent research.

At this point we are reminded that petitioner prepared marketing opinion reports on both the EPE and the EPS recyclers to promote the Plastics Recycling leasing programs.  Petitioner represented to potential investors that he had conducted a detailed independent investigation of the matter and that he thought investment in the Plastics Recycling programs would be profitable.  In light of this fact, petitioner's limited investigation of the alleged uniqueness of the Sentinel recyclers and petitioner's allegation regarding the anticipated profitability of the Plastics Recycling programs appear even less reasonable.

---

[6](...continued)
packaging and plastic industries and editors of plastics trade journals."  Based on the record developed at trial, however, we are not satisfied that petitioner made such independent inquiry.

Petitioner had a financial stake in promoting the Plastics Recycling leasing programs. He was paid $500 each time his report was used in a private offering memorandum. This fact provided petitioner with the incentive to assert, without much independent investigation, that the Plastics Recycling programs would be profitable.

Petitioner next presents us with the so-called oil crisis argument. He asserts that after reading a number of articles discussing the perceived oil crisis of the 1970's and the early 1980's, he reasonably concluded that investment in the Plastics Recycling leasing programs would be profitable. He based this conclusion on the fact that plastic is an oil derivative. He indicated that during 1981 and 1982 the prevailing opinion was that, due to the so-called oil crisis, the price of crude oil was going to increase significantly. Finally, he relies on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994), and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), as support for his contention that his investment in the Plastics Recycling leasing programs was reasonable in light of rising oil prices.

Petitioner's so-called oil crisis argument has been made in more than 20 of the plastics recycling cases. See, e.g., Provizer v. Commissioner, T.C. Memo. 1992-177; Merino v. Commissioner, T.C. Memo. 1997-385; Singer v. Commissioner, T.C.

Memo. 1997-325; <u>Sann v. Commissioner</u>, T.C. Memo. 1997-259.  We have found this argument to be unpersuasive in every one of those cases.  Petitioner's argument is not different in any substantive manner, nor has petitioner relied on any legal authority not previously considered in those cases.  We will not revisit the oil crisis argument.  We hold that the oil crisis did not provide a reasonable ground for petitioner to conclude that his investment in the Plastics Recycling leasing programs would be profitable.

B.  <u>Reliance on the Advice of Experts</u>

Petitioner next contends that he is not liable for the additions to tax for negligence because he relied on the advice of experts.

Under some circumstances, a taxpayer may avoid liability for negligence based on the taxpayer's reasonable reliance on a competent professional adviser.  See <u>United States v. Boyle</u>, 469 U.S. 241, 250-251 (1985); <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd 501 U.S. 868 (1991).  However, reliance on professional advice, standing alone, is not an absolute defense to negligence; rather it is a factor to be considered.  See <u>Freytag v. Commissioner</u>, <u>supra</u>.

Petitioner claims that he relied on representations by Bambara and Taggert regarding the uniqueness of the Sentinel

recyclers.[7]  Bambara and Taggert were promoters of the Plastics

Recycling leasing programs.  Reliance on representations by

insiders or promoters has been held to be an inadequate defense

to negligence.  See Goldman v. Commissioner, 39 F.3d 402 (2d Cir.

1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94

T.C. 637, 652-653 (1990), affd. without published opinion 956

F.2d 274 (9th Cir. 1992), affd. in part without published opinion

sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991).

Further, in general a taxpayer cannot reasonably rely on the

advice of the promoter of a tax shelter with respect to the

substantive merits or the tax treatment of items in connection

with that program.  See Patin v. Commissioner, 88 T.C. 1086, 1131

(1987), affd. without published opinion 865 F.2d 1264 (5th Cir.

1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th

Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93

(9th Cir. 1989), affd. per curiam without published opinion sub

nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988);

Kleiger v. Commissioner, T.C. Memo. 1992-734.  Advice from such

individuals "is better classified as sales promotion".  Vojticek

---

[7]  Petitioner also claims that he discussed his investment
with one of his colleagues, a professor knowledgeable in the
plastics industry, who opined to petitioner that the investment
appeared profitable.  Petitioner relied principally on his own
testimony in an effort to establish this matter.  However, we do
not find petitioners' self-serving testimony sufficient or
particularly reliable in this regard.  See Tokarski v.
Commissioner, 87 T.C. 74, 77 (1986); Hawkins v. Commissioner,
T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325
(6th Cir. 1995).

v. Commissioner, T.C. Memo. 1995-444.  Thus, petitioner's reliance on representations made by Bambara and Taggert was not reasonable.

Petitioner also claims that he relied on the advice of his accountant.  For reliance on professional advice to excuse a taxpayer from negligence, the taxpayer must show that the professional had the requisite expertise, as well as knowledge of the pertinent facts, to provide informed advice on the particular subject matter.  See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. per curiam T.C. Memo. 1993-621; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra.  A taxpayer may not reasonably rely on the advice of an accountant who knows nothing about the nontax business aspects of the contemplated venture.  See Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985).

In the present cases, there is no indication that petitioner's accountant had any knowledge of the nontax business aspects of the Plastics Recycling leasing programs.  Thus, although  petitioner's accountant prepared the returns for the years in issue, there is no indication that petitioner ever discussed the substantive merits of the tax treatment of items in connection with his investments in Plymouth and Taylor.  We are not satisfied that petitioner's accountant possessed the complete and necessary information to advise petitioner on the deductibility of the losses or the allowability of the credits

claimed.  Cf. <u>Hull v. Commissioner</u>, T.C. Memo. 1991-582.  Under these circumstances, petitioner's alleged reliance on his accountant does not relieve petitioner of liability for the additions to tax for negligence.

C.  <u>Concern for the Environment</u>

Finally, petitioner directs our attention to his interest in recycling and his desire to conserve natural resources.  At trial, petitioner described in detail his efforts to recycle.  For instance, petitioner pointed out:

> As a child of the great depression, * * * I firmly believed in eliminating waste, recycling and protecting valuable and diminishing natural resources.  For example, I have used the reverse side of incoming mail and of my old manuscripts for years.  I reuse incoming manila envelops and packaging.  I shut off lights, heat, water, doors and windows that are not being used.

We have no reason to doubt petitioner's testimony in this regard.  Yet, we fail to see how petitioner's concerns regarding the environment make his investments in two partnerships, both of which were designed to shelter income from taxation and produce other tax benefits, any more reasonable.  Although petitioner's concern for the environment may have provided some motivation to consider the Plastics Recycling leasing programs, petitioner should have thereafter reasonably investigated his prospective investments.  As already noted, independent investigation would have revealed the true nature of the Sentinel recycling programs as economic shams.

There is no indication that petitioner took any steps to ensure that, or even to inquire whether, the recyclers were actually placed with end-users.  Surely, concern for the environment would have led him to do so.  Based on the record, we do not think that petitioner would have invested in the Partnerships were it not for the prospect of the sizable tax benefits that the Partnerships offered.  Thus, even if petitioner were enthusiastic about recycling, petitioner did not act reasonably by claiming deductions and credits with respect to the Partnerships.

D.  Conclusion Regarding Negligence.

In view of his sophistication and educational background, petitioner learned or should have learned that the Sentinel recyclers were not unique, that they were not worth in excess of $50,000 each, and that Plymouth and Taylor lacked economic substance and had no potential for profit.  Therefore, under the circumstances of these cases, petitioner failed to exercise due care in claiming loss deductions and tax credits with respect to the Partnerships on his Federal income tax returns for 1981 through 1984.  Taking all of the above factors into consideration, we think it is more likely than not that petitioner invested in the Partnerships in an effort to generate tax benefits, rather than to make a profit.

Upon consideration of the entire record, we hold that petitioner is liable for the additions to tax for negligence

under section 6653(a)(1) and (2) for the years in issue.

Respondent is sustained on this issue.

Issue (4)  Section 6659 Valuation Overstatement

Petitioner also contests the addition to tax for valuation overstatement under section 6659 for the years in issue.

A value claimed on a return that exceeds the correct value by 150 percent or more constitutes a valuation overstatement. See sec. 6659(c).  With respect to the Plymouth investment, we have found that Sentinel EPE recyclers valued at $1,162,667 each did not have a value exceeding $50,000 per machine.  With respect to the Taylor investment, we have found that Sentinel EPS recyclers valued at $1,750,000 each did not have a value exceeding $50,000 per machine.

Although petitioner declined to stipulate the value of the Sentinel recyclers at issue, petitioner presented no evidence by way of expert testimony to contradict the conclusions reached by respondent's experts.  The record is devoid of any evidence indicating that petitioner conducted a meaningful investigation to value the Sentinel recyclers.  We have extensively considered the value of the Sentinel EPE recycler and the value of the Sentinel EPS recycler and have concluded as an ultimate fact that the Sentinel EPE and EPS recyclers did not have a fair market value at that time in excess of $50,000 each.  See also Gottsegen v. Commissioner, T.C. Memo. 1997-314; Provizer v. Commissioner,

T.C. Memo. 1992-177. Having so concluded, it follows that there was a valuation overstatement under section 6659.

Finally, petitioner contends that respondent abused his discretion in failing to exercise the authority under section 6659(e) to waive the addition to tax for valuation overstatement.

Under section 6659(e), the Commissioner may waive all or any part of the addition to tax for valuation overstatement based on a showing by the taxpayer that there was a "reasonable basis for the valuation * * * claimed on the return and that such claim was in good faith." The Commissioner's waiver is discretionary and subject to review for an abuse of discretion. See <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992); <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994).

On the record before us, there is no indication that petitioner requested a waiver from respondent at any time prior to the filing of his posttrial brief. Given that petitioner failed to establish a timely request for a waiver, we cannot hold that respondent abused his discretion in failing to waive the addition to tax. See <u>Haught v. Commissioner</u>, T.C. Memo. 1993-58. In any event, there is nothing in the record to establish that there was a reasonable basis for the <u>valuation</u> as required by section 6659(e). In light of the stringent standard for abuse of discretion, we cannot conclude that respondent abused his discretion in failing to exercise the authority under section 6659(e) to waive the addition to tax for valuation overstatement.

In view of the foregoing, we sustain respondent's determination that petitioner is liable for the addition to tax for valuation overstatement under section 6659 for each of the years in issue.

Other Matters

Petitioner's final contention to be considered is that respondent is precluded from making an assessment for the taxable year 1982 because respondent initially issued a no-change letter for that year.

Petitioner cites no cases in support of his position.  We observe that petitioner's position is clearly contrary to well-established law that issuance of a no-change letter generally does not preclude respondent from subsequently issuing a notice of deficiency.  See Opine Timber Co. v. Commissioner, 64 T.C. 700 (1975), affd. without published opinion 552 F.2d 368 (5th Cir. 1977); Lawton v. Commissioner, 16 T.C. 725, 727 (1951); see also Collins v. Commissioner, 61 T.C. 693, 700-701 (1974); Fitzpatrick v. Commissioner, T.C. Memo. 1995-548.

For respondent's no-change letter to be binding, petitioner must show the elements of estoppel.  See Fitzpatrick v. Commissioner, supra.  However, petitioner does not allege or argue estoppel, nor does the record provide any basis for such a claim.  Further, the no-change letter does not in any manner constitute a closing agreement.  See sec. 7121; sec. 301.7121-1(d), Proced. & Admin. Regs.

Accordingly, respondent is not precluded from making an assessment for the taxable year 1982 after having issued a no-change letter for that year.[8]

Petitioner has made other arguments that we have considered in reaching our decision.  To the extent that we have not discussed these arguments, we find them to be without merit.

To reflect our disposition of the disputed issues, as well as the parties' stipulation of settled issues,

> <u>Decisions will be entered</u>
>
> <u>for petitioner Bernice M. Ulanoff</u>
>
> <u>and for respondent as to petitioner</u>
>
> <u>Stanley M. Ulanoff</u>.

---

[8]  In addition, we note that at issue for 1982 are so-called affected items consisting of additions to tax for negligence and overvaluation.  See <u>N.C.F. Energy Partners v. Commissioner</u>, 89 T.C. 741, 744-746 (1987).  The TEFRA procedures, codified at secs. 6221 through 6233, segregate adjustments attributable to an individual's interest in a partnership from all other adjustments to the individual's return.  See <u>Maxwell v. Commissioner</u>, 87 T.C. 783, 787-788 (1986).  Respondent's examination of petitioner's individual return for 1982 would therefore not have focused on affected items.